Filed 10/2/14  In re Clyde G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re CLYDE G., et al., <br><br> Persons Coming Under the Juvenile Court Law. | B253028 <br> (Los Angeles County <br> Super. Ct. No. CK98699) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TANIA M., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court for Los Angeles County, Tony L. Richardson, Judge.  Reversed and remanded.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

Tania M. (mother) appeals from the jurisdiction and disposition orders of the juvenile court regarding her sons, Clyde G. and Phillip G. Mother contends (1) there was insufficient evidence to support the juvenile court's findings sustaining allegations that mother's acts or omissions caused her sons to suffer, or raised a substantial risk that her sons will suffer, serious physical harm or illness; (2) there was insufficient evidence to support the juvenile court's finding that removal of her sons from mother's custody was necessary to protect them; and (3) the juvenile court violated the notice requirements of the Indian Child Welfare Act (25 U.S.C. § 1901, et seq.) (ICWA). Respondent Los Angeles County Department of Children and Family Services (the Department) concedes there was insufficient evidence to support the jurisdictional findings as to three of the counts alleged against mother, and that the ICWA notice requirement was not satisfied, but contends there was sufficient evidence to support the juvenile court's orders as to two of the counts alleged against mother. We conclude there was insufficient evidence to support the juvenile court's jurisdiction order as to mother on those counts and reverse the order to the extent it finds jurisdiction as to mother. However, because the children's presumed father pleaded no contest to allegations as to him, the juvenile court retains jurisdiction over the children. Accordingly, we remand the matter to the juvenile court to reconsider the disposition order in light of our opinion.

**BACKGROUND**

In April 2013, mother had three children: sons Clyde (almost three years old) and Phillip (one and a half years old), and daughter Lelah H. (five months old). All three children were under the care of mother's aunt, Delphine D., and mother's brother, Ryan M.; a family law court had awarded Delphine physical and

2

legal custody of Clyde and Phillip on April 4, 2013.[1]  Ryan did most of the care giving for the children, under Delphine's supervision.

Delphine, Ryan and the children were living temporarily in the home of a friend of Delphine, John Adams, because Delphine's longtime partner died and Delphine was having financial problems.  Also living in the home were Adams' sister-in-law, Bonnie Medina, Medina's two grandchildren (ages two and three; Adams and Medina were those children's legal guardians), and Adams' son, Mark Anthony Calderon.

On the weekend of April 19, 2013, Calderon's three children and their two younger half-siblings were visiting.  For the weekend, Calderon's children and mother's children slept in the den, along with Ryan and Calderon.  One of the visiting children (who was younger than Lelah) slept in the bassinet that Lelah ordinarily slept in.  Ryan and mother's children slept on the floor.  Ryan made a pallet for Lelah to sleep on, using her blankets.

At around 1:30 a.m. on the morning of April 20, Ryan gave Lelah a feeding and placed her back on the pallet.  Later that morning, he was changing Phillip's diaper and looked over at Lelah.  He saw something under her nose and went to wipe it.  When he picked her up, he realized she was not breathing.  Someone called 911.

Paramedics arrived and transported Lelah to the hospital, where she was pronounced dead by attending physician Dr. Rauch.  Dr. Rauch stated the actual cause of death was not known at the time, but that the probable cause appeared to be "Smothering or Shaken Baby Syndrome."

---

[1]  The family law matter had been filed by Clyde G., Sr. (father), the presumed father of Clyde and Phillip, and did not involve Lelah, who had a different father. Mother was incarcerated at the time of the family court hearing, and did not participate. Custody was awarded to Delphine *pendente lite* pending a May 15, 2013 review hearing.

The Department was contacted, and a social worker interviewed all of the adults present in the home at the time of the death, and assessed all of the children. All were cooperative, and all of the children appeared to be well cared for, with no signs of abuse. The social worker also spoke by telephone with mother two days later. Mother told the social worker that she did not have a cell phone or permanent address, and that she was unable to care for her children at that time. She explained that her relatives always provided care for the children, and she never had any concerns about the children in the care of her aunt, Delphine, and her brother Ryan.

The Department conducted a home assessment, and found there was an unfenced swimming pool in the back yard that appeared not to have been cleaned for some time; there was, however, an alarm on the patio door that alerts with a beeping sound whenever the door is opened. On April 24, the Department received information from a deputy coroner, based upon the reports of detectives who observed the autopsy. The detectives reported that Lelah was clean and well nourished, no trauma was seen, and the cause of death was "non-criminal."

The Department also examined the family's prior child welfare history and the criminal histories of mother, father, and the adults living in the house at the time of Lelah's death.

The Department noted that mother's two older children had been the subject of a referral in August 2012, alleging neglect by mother. The caller reported that mother was using drugs and not allowing father to see the children. In its investigation of that referral, a social worker spoke to the children's maternal grandmother, who reported that father (whom the grandmother believed called in the referral) was abusive and violent, and trying to make mother look bad. The social worker also spoke to the maternal great aunt, Lynetta W., who was caring for the children at that time. Lynetta, who also believed that father was the source

4

of the referral, described an incident of domestic violence by father against mother, and said that a family law judge gave full custody of the children to mother after she drug tested with negative results. The Department asked mother to drug test in August 2012, but she did not appear for the test. The Department concluded its investigation by finding the allegation of general neglect was inconclusive.

With regard to criminal histories, the Department found that mother had multiple arrests and convictions for possessing controlled substance paraphernalia, among other crimes, and that father had an extensive criminal history that included both drug crimes and violent crimes. In addition, the Department found that Calderon (the son of the home's owner, who lived in Adams' home) had a conviction for cruelty to a child, among other convictions.

On April 26, 2013, the Department filed a juvenile dependency petition alleging five counts under Welfare and Institutions Code[2] section 300, subdivision (b), and one count under section 300, subdivision (j). The first three counts alleged that mother made an inappropriate plan for the children's care and supervision by leaving the children in the care of their maternal great aunt, who (1) caused Lelah to sleep on the floor in an unsafe sleeping environment (count b-1); (2) allowed an unrelated adult with a criminal history of child cruelty to reside in the same home as the children (count b-2); and (3) caused the children to live in a home with an unfenced swimming pool partially filled with black water (count b-3). In each count, the Department alleged that mother's inappropriate plan for the children placed the children at risk of physical harm, damage, and danger. Count b-4 alleged that mother has a history of illicit drug use that renders her incapable of providing regular care and supervision of the children, which places the children at risk of physical harm and damage, and count b-5 alleged that father has a history of

---

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

violent crimes and domestic violence, which places the children at risk of physical harm and damage. The single count under section 300, subdivision (j), was identical to count b-1.

At the detention hearing, the juvenile court found a prima facie case under section 300, subdivisions (b) and (j), and ordered the children detained in shelter care. The court also found that Clyde G., Sr. is the presumed father of both children, and ordered the Department to conduct a pre-release investigation of father.

The Department conducted the investigation and concluded that the children should not be released to father. The Department noted that father was ordered by the family law court to complete anger management and parenting classes, but he had not completed them. The Department also noted that father admitted he and mother were involved in two instances of domestic violence, one of which took place in the presence of Clyde Jr. when he was a baby; mother and father separated after that incident and have not been together since then. Father also admitted another incident of domestic violence with his new girlfriend after he and mother separated.

In May 2013, mother filed a form stating that one or more of her ancestors is or was a member of a Cherokee tribe. Mother also filled out a parentage questionnaire for each of her children. She stated that either Nigal D. or father was the father of Clyde Jr., and that either "Mario" or father was the father of Phillip. The juvenile court ordered a DNA paternity test for father. The test results showed that father was not the biological father of either child.

In its jurisdiction/disposition report filed on August 2, 2013, the Department reported that mother said she was not ready to be a mother when she had her first child, and relied upon the assistance of her family to help her with her children. Mother lived with her mother, Phyllis M., when Clyde was born in 2010 and while

6

she was pregnant with Phillip. By July 2012, both children were living with Delphine and Ryan. In September 2012, Delphine took the children to live with Lynetta while repairs were being made to Delphine's house. When Lynetta would not allow mother's new boyfriend (the father of Lelah) to stay in her house, mother took the children back to Phyllis' home, where they lived from October 2012 to January 2013. When Phyllis had surgery in January 2013, the children (including Lelah, who was born in November 2012) were returned to the care of Delphine and Ryan, who had moved into John Adams' home.

In that same report, the Department reported that Denise Bertone from the coroner's office told the Department's investigator on June 24, 2013, that Lelah died of Sudden Infant Death Syndrome. Bertone stated there were no anatomical findings for suffocation, and it could not be determined if external causes were involved. She noted there were unsafe sleeping conditions, in that Lelah had been sleeping face down on soft bedding.

The Department also reported on their investigator's May 20, 2013 interview with mother. Mother stated that she asked her family to help her with her children because she was not ready to be a mother and believed she had post partum depression. Mother indicated that she wanted the children returned to the custody of Delphine and Ryan. She also said that she and father had abused crack cocaine together, but she never used drugs while she was pregnant and has been sober since 2008. She said she would be willing to drug test once the court orders her to do so.

On August 2, 2013, the day of the jurisdiction/disposition hearing, the Department filed an amended petition. The amended petition added two claims (one under subd. (a) and the other under subd. (b) of § 300) based upon allegations of domestic violence that took place in January 2011 and before. In count a-1, the amended petition alleges that mother's and father's violent conduct places the children at risk of physical harm, damage, and danger. In count b-6, the amended

7

petition alleges that the "unresolved conflict between the parents places the children at risk of harm." The amended petition also deleted the count under section 300, subdivision (j). Attached to the amended petition were forms stating that Clyde and Phillip are or may be a member or eligible for membership in the Cherokee or Blackfeet tribe.

The jurisdiction/disposition hearing was continued for three months. In a supplemental report filed for the continued hearing, the Department reported that mother was homeless, unemployed, and pregnant. She was enrolled in the Black Infant Health Program in Pasadena, a program for pregnant women that provides general information about the care of a child; the program does not provide specialized programs for domestic violence or drug rehabilitation. She was enrolled in random drug testing in October, but missed her drug tests.[3]

The Department also provided the court with the coroner's report. The coroner's report states that "no definitive cause of death was identified. As such, this is considered a case of sudden unexplained infant death (SUID)." The coroner listed various risk factors for SUID, which include "sleeping on the belly or side, bed sharing, unsafe sleeping surface such as soft bedding and/or excessive bundling." The coroner also noted there were no signs of fatal trauma or evidence of drug intoxication.

At the jurisdiction/disposition hearing, the juvenile court noted that count a-1 (one of the two counts related to mother's and father's past incidents of domestic violence) and count b-5 (based on father's criminal history) were stricken. The court received into evidence the various reports that had been filed by the Department, and no other evidence was presented. Mother's counsel argued

---

[3] We note there is no court order in the record ordering mother to participate in random drug testing.

8

that all counts against mother should be dismissed. Counsel argued that mother could not be held responsible for Lelah's death, and that mother had no reason to believe there was any risk of harm to her children by having them cared for by Delphine, who had been awarded custody by the family law court, and Ryan. Counsel also argued that mother's history of drug use was not sufficient to establish any current risk of harm to the children, and that the allegation regarding domestic violence should be sustained only as to father because mother was the victim of father's abuse.

The juvenile court found the Department had met its burden of proof to establish jurisdiction with respect to counts b-1, b-2, and b-3 (the inappropriate plan counts), and b-4 (the history of drug use count). The court expressed some concern about count b-6, the domestic violence count, because the last incident had occurred more than two years before the petition, but nevertheless found jurisdiction under that count because the incidents "were unresolved."[4] Having declared the children dependent children under section 300, subdivision (b), the court moved on to disposition, and found by clear and convincing evidence that there was a substantial danger if the children were returned to the custody of either parent. The court ordered the children placed under supervision of the Department for placement in the approved home of a relative or non-relative extended family member, and ordered a case plan for mother that included a drug/alcohol program with random testing, a domestic violence program, and counseling. On the form case plan, the court checked a box indicating that ICWA did not apply.

Mother timely filed a notice of appeal from the jurisdiction, disposition, and paternity findings and orders.

---

[4] Father waived his rights and entered a no contest plea to the petition. The only count alleged against him was b-6.

9

**DISCUSSION**

As noted, mother contends on appeal that there was insufficient evidence to support the juvenile court's jurisdiction and disposition findings, and that the court violated the ICWA notice requirements. We conclude there was insufficient evidence to support the juvenile court's finding of jurisdiction as to mother. However, because jurisdiction remains as to father, we remand to the juvenile court to reconsider its disposition order and to comply with the ICWA notice requirements.

A. *Requirements for Establishing Dependency Jurisdiction and Standard of Review*

Section 300 provides, in relevant part, that a child is within the jurisdiction of the juvenile court and may be declared to be a dependent child of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." (§ 300, subd. (b).) The purpose of section 300 is "to limit court intervention to situations in which children are threatened with serious physical or emotional harm" as a result of their parents' conduct. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 303.) To establish jurisdiction under section 300, subdivision (b), the following elements must be shown: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) The Department has the burden of proof on these elements, and must

show specifically how the child has been or will be harmed by a parent's conduct. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.)  Moreover, the evidence must show "that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur)."  (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1396;  see also *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820, 824.)

When the sufficiency of the evidence to support a juvenile court's finding of jurisdiction is challenged on appeal, the reviewing court  must "review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.] 'However, substantial evidence is not synonymous with *any* evidence.  [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.]  Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]."  [Citation.]  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  [Citation.]' [Citation.]"  (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

B. *Substantial Evidence Does Not Support the Juvenile Court's Finding of Jurisdiction as to Mother*

Although the juvenile court found the Department had met its burden, and sustained the petition as to all of the counts, the Department "concedes that the juvenile court erred in sustaining the findings involving mother's failure to provide

11

[an] appropriate plan of care for the children under section 300, subdivision (b), counts b-1, b-2, and b-3." We agree. Thus, the only counts at issue in this appeal are count b-4, based upon allegations of mother's history of drug use, and count b-6, based on allegations of domestic violence between mother and father in or before January 2011.

### 1. Count b-4

There is no question that the Department presented sufficient evidence of mother's history of drug use. What is missing is any evidence that mother's use of illicit drugs caused serious physical harm to Clyde or Phillip, or puts them at risk of suffering serious physical harm. Rather, the evidence is that mother was aware of her inability to care for her children, and sought the assistance of her family members to care for them. The family members provided that care. Although one of the children died while in her family's care, the coroner concluded the cause of death was sudden unexplained infant death (which may have been related to the fact that the infant was sleeping on a soft surface), and observed there were no signs of trauma or evidence of drug intoxication. Importantly, Clyde and Phillip were found to be healthy and well cared for. In short, there is no evidence that mother's drug use caused any harm to the children or is likely to cause harm in the future.

### 2. Count b-6

Count b-6 alleges that mother and father "have an unresolved history of engaging in physical altercations in the presence of the children," citing an incident that took place in January 2011 (when Clyde was an infant and Phillip had not yet been born), and that "[s]uch unresolved conflict between the parents places the children at risk of harm." In sustaining this count, the juvenile court noted it had

considered striking the count because there was no evidence of any altercations after January 2011, but the court found there was sufficient evidence to sustain the count because "those incidents were unresolved."

However, the evidence shows that the incidents *were* resolved, because mother and father separated right after the January 2011 incident and have not been together since. Thus, this case is not like those in which a parent fails to protect a child by remaining in an abusive relationship. Moreover, although there is evidence that father has subsequently been involved in domestic violence incidents with others, there is no such evidence as to mother, and no reason to believe that she is or will be involved in another relationship involving domestic violence in the presence of her children. Finally, the family law court granted custody of the children to Delphine and ordered that father's visitation be supervised. (See *In re A.G.* (2013) 220 Cal.App.4th 675, 677 [where family court order eliminates risk of harm to children, the matter belongs in family court; there is no reason for dependency proceeding].) Thus, there is no evidence that mother's history of domestic violence raises a substantial risk that the children will suffer serious physical harm.

C. *The Juvenile Court Must Reconsider its Disposition Order*

Because we conclude there is insufficient evidence to support the sustaining of the amended petition as to mother, the jurisdictional finding as to mother must be reversed. Ordinarily, the reversal of a jurisdictional finding would require reversal of the disposition order. We note, however, that father pleaded no contest to the petition[5] and did not appeal from the juvenile court's jurisdiction order. Therefore, the children remain dependents of the juvenile court. (*In re Alysha S.*

---

[5] The only count that alleged conduct by father was count b-6.

(1996) 51 Cal.App.4th 393, 397 ["a jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent"].)

Although we found there was insufficient evidence to support the allegations of count b-6 as to mother -- relying in part on the lack of evidence to show a substantial risk of harm to the children in light of the family law court's order granting custody to Delphine and requiring father's visits to be supervised[6] -- we have no jurisdiction to reverse the jurisdiction order as to father. However, because the juvenile court's disposition order removing the children from the custody of mother was based primarily on the court's jurisdiction findings as to mother, for which we found there was insufficient evidence, we must remand the matter to the juvenile court with directions to reconsider the disposition order. Nothing in this opinion precludes the juvenile court from concluding on remand that dependency jurisdiction is unnecessary in light of the family court order, and dismissing this dependency case.

D. *The Juvenile Court Must Comply With ICWA on Remand*

As noted, mother submitted forms stating that Clyde and Phillip are or may be members or eligible for membership in the Cherokee or Blackfeet tribe. Under ICWA, when a court knows or has reason to know that an Indian child is involved in a dependency proceeding, notice must be given to the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right to intervene. (25 U.S.C. § 1912(a); *In re Francisco W.* (2006) 139 Cal.App.4th 695, 702.) To enable the juvenile court to review whether proper notice has been given, the Department must file with the court the ICWA notice,

---

[6] The family law court also ordered father to complete anger management and parenting classes.

return receipts, and any responses received from the tribes and/or Bureau of Indian Affairs. (*In re Francisco W.*, *supra*, 139 Cal.App.4th at p. 703.)

Mother asserts, and the Department concedes, that no ICWA notices were sent in this case. We agree there is no evidence that the Department sent any ICWA notices. Accordingly, on remand, unless the juvenile court determines that dependency jurisdiction is unnecessary and dismisses the action, the court shall order the Department to comply with the ICWA notice provisions and file all required documentation with juvenile court.

## DISPOSITION

The juvenile court's orders as to mother are reversed, and the matter is remanded for the juvenile court to reconsider its disposition order. Unless the juvenile court dismisses the dependency action, the court shall order the Department to comply with the ICWA notice provisions and file with the juvenile court all required documentation. If, after proper notice, a tribe claims the children as Indian children, the juvenile court shall proceed in conformity with ICWA.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.          EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.