Filed 3/5/15  In re Georgiana B. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re GEORGIANA B., a Person Coming Under the Juvenile Court Law. | B255628 (Los Angeles County Super. Ct. No. CK66726) |

| |
|---|
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, |
|     Plaintiff and Respondent, |
|     v. |
| HANA M., |
|     Defendant and Appellant. |

APPEAL from orders of the Superior Court of Los Angeles County.  Sherri Sobel, Juvenile Court Referee.  Affirmed.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Hana M. (Mother) appeals from the juvenile court's March 28, 2014 jurisdictional order, contending substantial evidence did not support the juvenile court's order adjudging 11-year-old Georgiana B. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1]  She also contends the court erred in failing to dismiss the petition as to Mother after the court struck Father from the petition.  She further claims the court abused its discretion in denying her request for a third continuance of the adjudication hearing.  Gregory B. (Father) is not a party to the appeal.  We conclude the court did not err in failing to dismiss the petition as to Mother after the court struck Father from the petition; substantial evidence supported jurisdiction under section 300, subdivision (b); and the court did not abuse its discretion in refusing to continue the adjudication hearing a third time.  We affirm.

## BACKGROUND

**The section 300, subdivision (b) petition**

The Department of Children and Family Services (DCFS) filed a section 300 petition on behalf of Georgiana on June 26, 2013.  At the jurisdictional hearing held on March 28, 2014, the juvenile court sustained paragraph b-1 of the section 300 petition which, as amended, alleged that Mother had "mental and emotional problems including paranoid and delusional behavior, which rendered her unable to provide regular care" for Georgiana.[2]

**Events leading up to the jurisdictional and dispositional hearing**

*Mother's delusional episodes*

In June 2013, Father reported to the police that Mother and Georgiana were missing after Mother had left voice messages for him that vampires and others were

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] An allegation in paragraph b-1 of the section 300 petition stating, "The mother has failed to obtain mental health services for the mother's psychiatric condition," was stricken.  Paragraph b-2 of the section 300 petition, which alleged Father had a history of illicit drug abuse, including heroin and cocaine, and was a current abuser of marijuana with a positive toxicology screen on June 18, 2013, was dismissed.

trying to kill her and that Georgiana was gone. Henry J., the father of Mother's adult daughter, Jessica K., found Mother and Georgiana at Union Station in Los Angeles and brought them to the police department on June 17, 2013. On June 17, 2013, DCFS interviewed Mother and other family members in response to a referral by the police. Subsequently, on June 21, 2013, the juvenile court granted DCFS's removal order warrant for Georgiana, placing her in the care of Father.

During the interview, Mother was unable to engage in a focused discussion with DCFS, relating numerous delusions and failing to remain on topic. She stated that she had been preparing to take a bus to visit Jessica in Eureka in Northern California when Henry found her at Union Station and persuaded her to stay at a hotel. They argued the next day, and he chased her on his bicycle and found her in a phone store.

She also said that she had stayed at a bed-and-breakfast with Georgiana, but knew something was wrong when she saw the same pictures of wolves on the walls that had been sent to her on the Internet. Among other things, she told DCFS that 115,000 Albanians were harassing her and had sent her pictures of her name spelled backwards and of a woman with her throat slit. She told DCFS that Illuminati, Scientologists, and vampires were "after her," and referred to oddly named persons and Facebook pages run by Albanians. Mother said "the people harassing her" saw pictures of Georgiana on Facebook and told Mother that Georgiana looked like an alien. She "began to derail" and stated she was unsure whether the melting clocks in Salvador Dali pictures were real and that she saw melting clocks in a mirror when a man she had dated became angry with her. She stated that people were using Mickey Mouse and Hello Kitty against her. Mother showed DCFS pictures of Father's girlfriend, claiming she was evil. She said that people were "throwing these images at her" because she had been exposed to a secret. She wanted to take Georgiana to Pennsylvania and was extremely upset when DCFS told her she could not do so. She also stated she wanted to flee to Eureka or Pennsylvania, noting that the safety plan requiring Georgiana stay with Father was voluntary. She did not

3

think her statements caused behavioral issues for Georgiana, claiming any problems Georgiana had were Father's fault.

Mother denied any mental health history and current substance abuse, stating she had last used cocaine seven years ago during a New York dependency investigation. She fled New York because she knew she would drug test positive. She did not remember the last time she had taken Georgiana to a doctor, although she stated they both had their teeth whitened regularly. Mother tested negative in an August 18, 2013 drug test.

Georgiana told DCFS that Henry found them at the train station and asked them to stay in Los Angeles so he could help them. He got them a hotel room for the night. Henry told Mother he wanted to take her to the police station to get help. Georgiana said Mother was trying to protect her against people trying to hurt them. She said that Mother told her "'people are trying to hurt us, but she doesn't want to scare me.'" She believed the things Mother said were true and denied that Mother exhibited unusual behavior. She and Mother had stayed with different friends over the last year. Georgiana had attended several elementary schools. The last time she had seen a doctor or dentist was over a year ago, although she had gotten her teeth whitened with Mother.

Father told DCFS that Mother's behavior had gotten progressively worse over the last eight months after she broke up with an actor whom she now believed was threatening her. Father played messages to DCFS that Mother had left on his voicemail stating that she and Georgiana were homeless and vampires were trying to kill her, "they" believed Georgiana was an alien, and Scientologists believe aliens live "inside us." In one voicemail message, Mother laughed in a "maniacal" manner.

Father said Mother was homeless after going through a $250,000 advance from an investor in her hair product company. Mother was obsessed with her computer and had been asked to leave the home of a family friend after showing the friend's father disturbing pictures of Jeffrey Dahmer's victims on her computer. Mother and Georgiana had stayed at Father's home on June 14, 2013, but Mother left in a rage when she saw Georgiana singing with some neighbors. Father told DCFS that Mother claimed a metal

4

plate implanted over her heart by the Illuminati was so heavy she could not get up to take Georgiana to school on time. Mother had a history of pulling Georgiana out of school so she would not be alone. Georgiana had missed the last three days of school. Mother often dropped Georgiana at his house unannounced, without clean clothes, shoes, or homework. Mother then failed to return for days. Georgiana told Father that she and Mother would meet random strangers and stay at their houses. She also told him that everything Mother said was true because Mother showed Georgiana pictures on the Internet of the Illuminati and other things.

Father stated that Mother had moved from state to state, preventing Father from filing for custody. She had fled New York after testing positive for cocaine during a previous children's services investigation. In 2010, Mother had been awarded full custody of Georgiana in a Pennsylvania court, even though Father had told the judge of his concerns about Mother's mental health and her disappearances for lengthy periods of time.

Father stated he had abused heroin and cocaine 20 years ago and had one relapse 11 years ago. He denied current drug abuse and admitted to taking medical marijuana for high blood pressure. Father tested positive for marijuana on August 18, 2013. After that positive test, he began taking prescribed medication instead of medical marijuana for his high blood pressure.

Father reported that after the juvenile court detained Georgiana from the care of Mother and released her to Father on June 26, 2013, with monitored visits, Mother called maternal grandfather and threatened to slit his throat. By September 2013, Father had enrolled in counseling programs, accepted family preservation services, and facilitated visitation between Georgiana and Mother.

Maternal grandfather told DCFS that Mother had untreated mental health problems and that Mother's maternal side, including maternal grandmother, had an extensive history of mental illness. Maternal uncle had bipolar disorder and schizoid tendencies. Mother had been experiencing increasingly bizarre thoughts and actions over

the past eight months, claiming her life was being threatened by vampires who lived in tombs under the Staples Center and that people stalking her had placed a metal plate in her chest. Mother had extreme behavior changes, being nice one moment and cruel, nasty, and mean the next. Mother became furious after he refused to give her money and instead offered to help her get evaluated. He feared that Georgiana was suffering psychological harm.

Henry told DCFS that after the investor who gave Mother $200,000 for her company died, Mother spent the money "wildly" over a two-year period and eventually became homeless. Mother had taken Georgiana to different friends' houses as she wore out her welcome. Mother had olfactory hallucinations and visual and auditory delusions. She believed she was in the center of a conspiracy, spoke freely to Georgiana about her beliefs and delusions, and saw symbols in everything. Georgiana was protective of Mother and might believe Mother's statements. Upon being alerted by a "frantic" Jessica, Henry found Mother and Georgiana at the train station, where Mother was preparing to take Georgiana on a 16-hour bus ride with no food for her.

Jessica told DCFS that Mother's mental health had deteriorated over the past eight months. After Mother broke up with an actor, she believed he was part of the Illuminati and involved in a conspiracy against her. Among other things, Mother told Jessica that she had half human and half pig blood; she had seen eyeballs looking at her from a tree; she and Georgiana were going to be abducted; people wanted to eat her; and she had a metal plate in her chest which made it difficult for her to get out of bed and made her walk slowly. Jessica had received a call from the owner of a bed and breakfast, who stated Mother had acted bizarrely and had frightened another guest. Georgiana had given Jessica's number to the owner because she had been frightened by Mother's behavior. Jessica believed Georgiana was being psychologically and emotionally damaged by Mother, who made delusional statements in front of Georgiana and was unable to care for her.

Janet C., the owner of the bed and breakfast, related many incidents of Mother's extreme delusional behavior and stated Mother brought a man "she had met in the street" to the bed and breakfast. Jennifer B., the co-owner, stated Georgiana gave her Jessica's phone number to get assistance for the family.

### *Detention hearing, further investigation and upfront assessment*

On June 26, 2013, the juvenile court detained Georgiana from Mother and placed her with Father. The court ordered Mother to have twice weekly monitored visits, referrals for mental health assessment and counseling, and parenting counseling. DCFS was ordered to provide family maintenance services to Father. DCFS determined that child welfare referrals regarding unspecified allegations had been made on behalf of Georgiana and Jessica in Hawaii, New York, and Philadelphia. A 2006 referral alleging physical abuse by Mother against Jessica was closed as unfounded; a 2005 referral alleging Jessica and Georgiana had been emotionally abused by Mother's then-boyfriend had been substantiated; and a 2001 referral alleging neglect and emotional abuse by Mother against Jessica was closed as unfounded.

On July 11, 2013, Mother was assessed. She was described as demanding, suspicious, angry, and hostile. Mention of Father was a trigger to her anger. She related unclear and confusing stories of persecution by various people and entities. Her insight was described as inadequate, due to her failure to admit her "incongruent" thoughts and unsubstantiated stories. Mother reported consistent lack of employment and reliance on friends for support.

The assessor diagnosed Mother with psychotic disorder not otherwise specified and relational problem not otherwise specified. She recommended ruling out delusional disorder and paranoid personality disorder. She also recommended a psychiatric evaluation, individual therapy, and monitored visits with Georgiana without Father present. The assessor concluded Mother's unstable mental health, housing, and employment were risk factors to Georgiana.

7

*Continued adjudication hearings and DCFS reports*

On September 25, 2013, after granting Mother's request for a hearing made pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), the juvenile court granted Mother's motion to substitute counsel. The court appointed new counsel from the same law firm. The court continued the adjudication hearing to January 6, 2014. In the meantime, DCFS reported that Father drug tested negative, participated in counseling, and had so far completed 10 out of 12 required parenting classes. DCFS also reported Father had established a stable family unit that was supportive of Georgiana. DCFS further reported that Georgiana was progressing well with 14 individual therapy sessions and had a good relationship with Father and his girlfriend. Georgiana was happy, well-adjusted, and thriving in school. DCFS observed that Mother refused to provide DCFS with an address and her cell phone was not receiving messages.

At the January 6, 2014 hearing, the juvenile court granted Mother's request for a *Marsden* hearing. Although it denied her motion for new counsel, the court relieved her current counsel and appointed new counsel from the same law firm, apparently because Mother's current counsel was leaving the firm. Father and DCFS opposed a continuance of the adjudication. Georgiana's counsel also opposed a continuance but noted that Georgiana would not suffer detriment by a continuance because she was well cared for in Father's home. The court continued the adjudication to March 14, 2014, but warned that no further continuances would be granted.

On March 6, 2014, DCFS reported that Mother said she had been evaluated at Cedars-Sinai Medical Center (Cedars) twice and had been told she was not mentally ill, but was stressed, harassed, and heartbroken. Father told DCFS that Georgiana had been accepted into a gifted program and that she was a star student. Although DCFS arranged for twice weekly monitored visits for Mother, she had attended only two visits in January and three in February. At a visit in February, Mother became upset because Georgiana told her she was doing a school report on Lucille Ball. Mother called DCFS the next day to say she was not happy that Georgiana was doing a report on Lucille Ball and her best

8

friend was doing a report on Alfred Hitchcock, whom Mother regarded as "'dangerous'" characters. Mother did not like Lucille Ball's red hair and did not want Georgiana to dress up like her. Mother stated she did not want Georgiana to attend Los Angeles schools. She was angry because Georgiana went to the movies with her friends rather than with Mother. She angrily stated that everything in the DCFS reports was a lie.

On March 14, 2014, Mother's counsel was relieved and yet another attorney was appointed from the same law firm to represent her. The juvenile court expressed amazement that the petition had been filed on June 26, 2013, yet still had not been adjudicated. The juvenile court indicated to mother's new counsel that it did not "know what you need to subpoena" and noted that prior counsel "probably should have subpoenaed whatever there was that needed to be subpoenaed"; the juvenile court nonetheless continued the matter to March 28, 2014.

DCFS subsequently reported that at a visit on March 3, 2014, Mother denigrated a game that Father gave Georgiana even though Georgiana said she loved it. Mother referred to Father as a "Zero" for failing to pay child support. On a visit on March 5, 2014, Mother again referred to Father as "Zero" and angrily stated that he was getting recognition for how well Georgiana was doing, even though he did not do anything for her or pay child support. After repeatedly asking Mother to refrain from talking about Father, DCFS had to terminate the visit.

### *The March 27, 2014 motion for a continuance*

On March 27, 2014, Mother's counsel filed another request for a continuance, arguing that when he substituted in on March 14, 2014, he informed the juvenile court he needed a continuance of the adjudication hearing to obtain medical records from Cedars regarding mental evaluations of Mother. Counsel had not yet received the records. According to the declaration of the investigator retained by the law firm representing Mother, the records would be received by the law firm seven to 10 business days from March 27, 2014.

9

**The March 28, 2014 jurisdictional and dispositional hearing**

At the March 28, 2014 jurisdictional hearing, the juvenile court denied Mother's motion for a continuance, stating that the case had been filed almost a year ago. The court noted the motion had been filed the day before trial and stated the claim that the records might "alter some of the specifics of the jurisdictional hearing" was not well-taken and observed that given all the delay, Georgiana had been "betwixt and between for almost a year." The court concluded that the trial could proceed on the submitted evidence even if there was no specific diagnosis regarding Mother's mental state.

After argument of counsel, the juvenile court dismissed the petition as to Father and sustained the amended allegations of the petition as to Mother. The court observed that Georgiana was extremely bright, with very good grades, but was tardy to school 24 days and absent many days when she was living with Mother. The court noted Georgiana had given out Jessica's phone number because she had been frightened by Mother's behavior. It also noted extensive reports showed Mother's paranoid behavior had been affecting Georgiana for quite some time. Observing that there was no current evidence Mother had been given medication, the court struck the allegation in paragraph b-1 of the section 300 petition that stated, "The mother has failed to obtain mental health services for the mother's psychiatric condition."

Observing that Mother's behavior was "absolutely paranoid and delusional," and based on the reports, maternal grandmother's testimony that the latter behavior had been long-standing, and "a lay person's verdict just from seeing her around," the court sustained the amended allegation against Mother that she has mental and emotional problems, including paranoid and delusional behavior, rendering her unable to provide regular care and supervision of Georgiana.

The juvenile court ordered sole legal and sole physical custody to Father, visitation for Mother in a monitored setting with Father selecting the monitor, and mental health services for Mother. The court recognized that Mother could go to family court to "make any changes she wants," including custody, and that Mother must be able

10

to show "she currently is either taking medication or has not been prescribed medication."[3] The court then terminated jurisdiction with a family law exit order, which it ordered to be filed in any court in which a custody proceeding was pending or absent such a proceeding, in the court of the county in which Father was residing. Mother appealed.

## DISCUSSION

**The juvenile court did not err in failing to dismiss the petition as to Mother after striking Father from the petition**

We disagree with Mother's contention that the juvenile court erred in failing to dismiss the petition as to Mother after the court struck Father from the petition.

Mother relies on our opinion in *In re A.G.* (2013) 220 Cal.App.4th 675 (*A.G.*) for the proposition that if at the adjudication hearing, the juvenile court determines one parent can properly care for a minor and the petition is dismissed as to that parent, the petition should be dismissed as to the remaining parent. There, the mother had serious mental health issues and was living with the father and the minors at the time of the hearing. The father had hired a nanny to watch the minors when the mother was home and he was not. We held in that factual setting, where the minor was not in danger and given scarce public resources better put to exercising jurisdiction over neglected or abused children, the issue of custody should be resolved in the family court. Indeed, we remanded the case to the family court for a hearing on custody and visitation. (*A.G.*, at pp. 686–687.)

We do not have that factual setting here. It is true that Georgiana was living with Father at the time of the jurisdictional hearing, and by all reports, doing well. We thus recognize the seeming similarity to *In re A.G.* In marked contrast to *A.G.*, however, Father had no custodial rights; a Pennsylvania court had given sole custody to Mother.

---

[3] It is not entirely clear why the juvenile court included this language in its disposition. Mother, however, does not challenge this aspect of the disposition, so we do not address it.

11

Here, there was evidence that in the past, Mother forum shopped for a state in which to obtain a custody order that was far away from Father, and was contemplating moving Georgiana away from Father to Pennsylvania or Northern California at the time DCFS was investigating claims that Georgiana was in danger.

Unlike in *A.G.,* Georgiana was not living with both parents and there was no nanny or other adult in the house to protect Georgiana in the event Mother's mental health issues surfaced. In other words, in *A.G.* there was an adult other than Mother caring for the minors at all times. As detailed herein, there was also evidence that Mother and Georgiana stayed overnight with total strangers, and Mother allowed her to miss many days of school, left her in an unclean state, and did not take her to a dentist or doctor. Similarly, Georgiana came to DCFS's attention because several adults called regarding their concern for her, including the maternal grandfather, the adult half sister, and Father, when he could not locate Georgiana. In short, the differences between the instant case and *A.G.* are differences in kind and not just degree.

**Substantial evidence supported the juvenile court's jurisdictional findings under section 300, subdivision (b)**

Mother contends insufficient evidence supported the juvenile court's jurisdictional order as to the allegations under section 300, subdivision (b). We disagree.

Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if "there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."

"A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.] The third element 'effectively requires a showing that

12

at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . .' [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) Jurisdiction may be exercised "based on . . . a current or future risk." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435, fn. 5.)

The juvenile court's jurisdictional finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355; Cal. Rules of Court, rule 5.684(f).) "'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.) "[W]e must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

We conclude that substantial evidence supported the juvenile court's jurisdictional findings under section 300, subdivision (b). Mother's mental and emotional problems resulted in behaviors that placed Georgiana at serious risk of physical harm. Mother had been assessed with a psychotic disorder, with unstable mental health, housing, and employment described as risk factors to Georgiana. Family members stated Mother had gone through about $250,000 in two years, and was currently homeless and her whereabouts were not always known. Georgiana had moved from several schools because Mother went from place to place. Mother relied on friends for financial support, but ended up getting kicked out of their houses because of inappropriate behavior that

13

might have been generated by her mental illness. Additionally, Mother had been prepared to take Georgiana on a 16-hour bus ride without food for Georgiana; whether caused by mental illness or inability to care for Georgiana, this further supported a finding of neglect. Similarly, due to Mother's impaired judgment and lack of ability to provide adequate housing, Mother and Georgiana sometimes stayed overnight with random strangers, which placed Georgiana at risk of harm.

Family members gave consistent descriptions of Mother's extreme paranoid and delusional behavior, observing that Mother's behavior had worsened over the past eight months. Among many other delusions, she believed that there was a conspiracy of vampires, Albanians, the Illuminati, and Scientologists to kill her and Georgiana. Mother had serious paranoid delusions during their stay in a bed and breakfast, during which time Georgiana became frightened and gave Jessica's phone number to the owner of the bed and breakfast to seek assistance.

Mother also believed the Illuminati had placed a metal plate in her chest, which was so heavy she could not get up to take Georgiana to school. Thus, Georgiana was often tardy and missed many days of school while in Mother's care. We recognize that a minor's missing school may be insufficient grounds in itself to assert jurisdiction. In *In re Janet T.* (2001) 93 Cal.App.4th 377, Division Seven of this district deemed a petition facially insufficient where it alleged a mother's mere failure to ensure school attendance and "provided no other facts to suggest how mother's mental health problems created a 'substantial risk' her children would suffer 'serious physical injury or illness.'" (*Id.* at p. 389.) The facts here show not just absence from school, but Mother's increasingly bizarre delusions and paranoia, Mother's failure to acknowledge or treat her mental illness, Mother's inability to obtain employment or provide housing, and Mother's putting Georgiana at risk by staying with strangers.

At the time of the events giving rise to the petition, Mother had sole legal and physical custody of Georgiana. Mother had a history of moving from state to state to avoid children's services and indicated she wanted to take Georgiana to Pennsylvania or

14

Northern California. Without the assertion of jurisdiction, Father would not have been able to prevent Mother from leaving California with Georgiana. Mother argues that "Pennsylvania had arguably lost jurisdiction due to the child's continuing residence in California, making California arguably now qualif[ied] as Georgiana's 'home state,'" but at the same time, she recognizes that "the juvenile court never made any findings regarding interstate jurisdiction," and we conclude she has failed to show how the juvenile court erred.

Mother also claims DCFS failed to show Georgiana had been harmed by Mother's mental illness or was at risk of harm by her mental illness because Georgiana denied that Mother acted strange, Georgiana said Mother did not tell her scary things, and there was no evidence that Georgiana had adopted Mother's delusional beliefs. Georgiana's denial of Mother's behavior as strange is of concern, whether Georgiana was protecting Mother or accepting Mother's behavior as normal. At the page in the record cited by Mother, Georgiana did not state that Mother did not tell her scary things, but stated that Mother told her "people are trying to hurt us, but she doesn't want to scare me," thus reflecting Mother's paranoid views. Georgiana stated that Mother was telling the truth because she had shown Georgiana the Illuminati on the Internet, contradicting Mother's argument that Georgiana had not adopted her beliefs. Finally, Mother's argument that Georgiana was doing exceptionally well in school and had adjusted well to living with Father merely supports the propriety of the placement of Georgiana with Father.

Accordingly, we conclude substantial evidence supported the juvenile court's jurisdictional findings under section 300, subdivisions (b).

**The juvenile court did not abuse its discretion in denying Mother's request for a third continuance of the adjudication hearing**

Mother contends the juvenile court abused its discretion in denying her request for a third continuance of the adjudication hearing. We disagree.

15

The record shows that the juvenile court granted several continuances that pushed the adjudication hearing past the deadline mandated by statute. We conclude it did not abuse its discretion in denying yet another continuance.

Section 352, subdivision (a) provides that in general, "Upon request of counsel for the parent . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

Section 352, subdivision (b) also expressly states, "Notwithstanding any other provision of law, if a minor has been removed from the parents' or guardians' custody, no continuance shall be granted that would result in the dispositional hearing, held pursuant to Section 361, being completed longer than 60 days after the hearing at which the minor was ordered removed or detained, unless the court finds that there are exceptional circumstances requiring such a continuance." In no event "shall" the court grant a continuance that would cause a section 361 hearing to be completed more than six months after the initial petition hearing.

The juvenile court's order denying a continuance will be reversed "only upon a showing of an abuse of discretion." (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.)

Here, the detention hearing was held on June 26, 2013; therefore, the section 361 hearing should have been held six months after that, by December 26, 2013. The juvenile court granted two more continuances after that date. On March 27, 2014, the day before the adjudication hearing, Mother filed a request for yet another continuance. Because Georgiana was removed from Mother's custody, the court was required not to grant a

16

continuance that would result in the dispositional hearing being held 60 days after the detention hearing unless there was a showing of exceptional circumstances. The dispositional hearing was already held long after the required 60-day time period. We conclude Mother failed to show exceptional circumstances that would provide good cause for another continuance.

Mother claimed in a request made the day before the adjudication that she needed a continuance to procure medical records from Cedars. Mother, however, could have obtained her medical records herself and had the opportunity to obtain them earlier through her counsel, who were all affiliated with the same law firm representing her at the jurisdictional hearing, and who knew her mental state was a central issue in the case from its inception in June 2013. DCFS reported on March 6, 2014, that Mother claimed she had been examined at Cedars and reported to be stressed and harassed, but not mentally ill. Thus, her counsel were on notice of her claim that she had been examined, well before her March 27, 2014 request for a continuance. (See *In re A.B.* (2014) 225 Cal.App.4th 1358, 1366 [juvenile court did not abuse discretion in denying request for continuance where counsel had ample time to determine time period when minor had poor health].)

Further, as the juvenile court observed, the medical records were not necessary in light of the evidence that Mother's paranoid and delusional behavior placed Georgiana at risk, regardless of a particular diagnosis. As we explained above, there was substantial evidence in support of the court's findings, including consistent statements from family members, including Georgiana, and an assessment of Mother's mental health. Further, Mother fails to articulate on appeal whether the medical records contained relevant information resulting in a favorable result to Mother, and therefore has failed to demonstrate prejudice from the court's denial of her request for a continuance.

We disagree with Mother's argument that the juvenile court improperly admitted lay opinion—as opposed to expert opinion from Cedars—based on the court's comment that "even a lay person" could see Mother's mental and emotional problems placed

17

Georgiana at risk.  In making its findings, the court was exercising its role of weighing the evidence and assessing credibility; it was not admitting lay testimony.

For all these reasons, we conclude the juvenile court did not abuse its discretion in denying Mother's request for a third continuance of the adjudication hearing.

## DISPOSITION

The juvenile court's March 28, 2014 orders denying Hana M.'s motion for a continuance, asserting jurisdiction over Georgiana B., and terminating the matter with an exit order to the family court is affirmed.

NOT TO BE PUBLISHED.


BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18