Filed 10/22/13 (unmodified opinion attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re AIDEN G. et al., Persons Coming Under the Juvenile Court Law. | B248092 (Los Angeles County Super. Ct. No. CK96730) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CAROLINE G., Defendant and Appellant. | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 16, 2013, and certified for publication in the Official Reports be modified in the following particulars:

1.  On page 1 in the caption, the name AIDEN G. is deleted and the initials A.G. are inserted instead; and the name CAROLINE G. is deleted and the initials C.G. are inserted instead.

2.  On page 2, first paragraph, the name Caroline G. is deleted and the initials C.G. are inserted instead; the name Aiden G. is deleted and the initials A.G. are inserted instead; the name Elizabeth G. is deleted and the initials E.G. are inserted instead; and the name Scott G. is deleted and the initials S.G. are inserted instead.

3.  On page 3, first sentence of the second full paragraph, the names Aiden and Elizabeth are deleted and the initials A.G. and E.G. are inserted instead.

4.  On page 5, last sentence of the second full paragraph, the name Aidan is deleted and the initials A.G. are inserted instead.

5.  On page 7, last sentence of the paragraph that began at the bottom of page 6, the name Caroline [G.] within the quotation is deleted and the bracketed initials [C.G.] are inserted instead.

There is no change in the judgment.


MALLANO, P. J.          CHANEY, J.          JOHNSON, J.

Filed 10/16/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re AIDEN G. et al., Persons Coming Under the Juvenile Court Law. | B248092<br>(Los Angeles County<br>Super. Ct. No. CK96730) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CAROLINE G.,<br><br>    Defendant and Appellant. | |

    APPEAL from orders and a judgment of the Superior Court of Los Angeles County. Marilyn Kading Martinez, Commissioner. Reversed and remanded with directions to the family court.

    Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

    John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

————————————

Caroline G. (Mother) appeals from the February 14, 2013 jurisdictional and dispositional orders of the juvenile court adjudging minors Aiden G., born in December 2008, and Elizabeth G., born in May 2010, dependents of the court pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1] Scott G. (Father) is not a party to this appeal. The issue presented is whether the juvenile court should have sustained a petition alleging only that Mother is mentally ill and is unable to care for the minors where Father has always been, and is, capable of properly caring for them. While Mother's mental health is such that the minors would be at substantial risk if they were in Mother's custody, the custody order filed in the family court by the juvenile court after making the challenged adjudication and disposition orders eliminated such risk. Because the matter belonged in the family court, there was no reason for the juvenile court's adjudication and dispositional orders. We reverse and remand with directions to the family court.

## BACKGROUND

On August 28, 2012, law enforcement was called to the family home because Mother was yelling at the neighbors, claiming she was going to be the next female president. Mother was experiencing auditory hallucinations that were telling her to sing, run through the sprinklers, and lie down in the middle of the street. The minors "were in the family home at the time of the incident . . . and witnessed the event." The officers contacted the Los Angeles County Department of Children and Family Services (DCFS) and took Mother to the hospital because they determined she was a danger to herself or others. Mother remained hospitalized for two weeks. Mother later claimed the hospitalization was a "'mistake'" because she did not do anything wrong. She was again hospitalized in September for two weeks when she claimed to have supernatural powers, danced around, acted bizarrely, and claimed she was Jesus.

Mother subsequently failed to keep her psychiatric appointments and did not take her psychotropic medication, denying she had a mental illness and claiming her only

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

problem was insomnia. "[O]n at least one occasion," Mother told the nanny to go home, and the minors were alone with Mother for about three hours until Father returned home from work.

On November 30, 2012, DCFS reported the following. Mother stated she "'had a special gift from God and she was able to hear other people's conversations'" and sometimes the people she spoke to said bad things about her. Mother said she recently started taking her medication because she had a conversation with President Obama, who had convinced her to take them. Mother had one "suicidal episode" where auditory hallucinations ordered her to take pills and kill herself, but Mother stated "she had the pills but did not ingest them." In the presence of the minors, Mother had attempted to stuff a piece of paper down Father's throat, saying he was a "'monster.'" Father failed to take action for fear of escalating the situation; he was afraid to confront Mother about her delusions and hallucinations, and feared for the safety of the minors if they were left alone with her. Father and Mother were initiating divorce proceedings, which "raises the level of stress for both parents." Father was the minors' primary caregiver in the mornings while Mother slept. When the nanny took care of the minors, Mother stayed in her bedroom to write in her journal. "Therefore, [M]other has not been able to develop a loving maternal bond with" the minors, and Mother refused family preservation services.

On November 30, 2012, DCFS filed a section 300 petition on behalf of Aiden and Elizabeth, alleging under section 300, subdivision (b) that Mother had mental and emotional problems, including delusional behavior, auditory hallucinations, suicidal ideation, and a suicide attempt, which render Mother incapable of providing regular care of the minors; in August 2012, Mother was involuntarily hospitalized for evaluation and treatment; in September 2012, Mother was hospitalized for evaluation and treatment; and Mother failed to take her psychotropic medication.

On November 30, 2012, the juvenile court ordered the minors to remain released to Mother and Father under the following conditions: Mother to take her psychotropic medication as prescribed; Mother to continue with therapy treatment; Mother not to be

left alone with the minors; and Father to participate in individual counseling and family preservation services.

In December 2012, Mother reported to DCFS that she had special powers; she could channel the dead, who made her laugh; and she had spoken to President Lincoln, the Kennedys, Marilyn Monroe, and Michael Jackson. Mother read from her journal that "she is the second coming and she must inform everyone." She denied having ever heard a voice telling her to hurt herself or anyone else, and stated she would never harm her children. On December 27, 2012, Mother's psychiatrist reported that after discontinuing her medication, Mother "recently became very psychotic with poor insight and judgment."

On January 3, 2013, Mother told DCFS that "8 years ago" she had been diagnosed with "persecutory delusion" when she heard people shouting at her at work, saying "suspicious things," calling her on the telephone and hanging up on her. She stated that she had been seeing a psychiatrist for six years and had been taking medication for schizophrenia, but she had been misdiagnosed. She claimed her only problem was insomnia, and she did not want the doctors to continue to misdiagnose her. She denied she had suffered from suicidal ideation when she had lain down in the street. She claimed she was having a "'spiritual experience,'" not a "'psychological experience,'" and that she had looked both ways before she lay down. Mother had no idea how long she remained on the street. When asked what kind of spiritual experience she was having, "Mother refused to go into detail," saying it was hard to explain. Mother also reported she was complying with her medication and psychotherapy because she did not want to lose the minors. Although she claimed that she did not hear voices anymore, she also stated that "her God given talent [is] that she can hear people speak" and she has "angelic and spiritual ability." Mother was divorcing Father because he did not have the same spiritual beliefs. Mother said she was talking to "the people that talk[] to her" about her current situation and they had been giving her advice. DCFS reported that oftentimes Mother "is into her own world and during these times she totally detaches herself from her surroundings, even from her children."

4

On January 3, 2013, Father told DCFS that "7 years ago," Mother started having paranoid thoughts at work. Subsequently, Mother was under the care of a psychiatrist and did well for four or five years. Then she stopped taking her medication. Father convinced her to go back on medication, but it took some time for the medication to work because Mother had been off her medication for so long. From that time, Mother has been "experiencing conversations and it never stopped." Mother was not violent toward the minors or suicidal. Rather, she felt euphoria and invincibility. She believed she was "'the chosen, she feels the presence and experience[s] things and hears conversations.'" Mother also claimed to be the president when she had lain down in the street and jumped through sprinklers. Father had stopped trying to convince Mother to take her medication or attend therapy, "as [M]other does not like that." Recently, she had isolated herself and had stopped talking to family members.

The current nanny, who had worked for the family for two years, told DCFS that Mother went out on a regular basis but sometimes cooked for the minors and did the laundry. Mother sometimes played with the minors for short time periods but was usually working on the computer or writing in her journal. Aidan had "to call her out loud 'mommy' 'mommy' to get her attention."

Maternal grandfather stated that when Mother visited him during Christmas, Mother heard voices every 15 to 20 minutes, and when she did so, she would go into the bathroom. She called the police once at 3:00 a.m. under the mistaken belief that a relative was trying to take the minors away from her.

In-house counselor Cyndi Bellamy reported that Mother would become upset when Father disagreed with her; Mother had complained about gaining weight while on medication and was only taking half the prescribed dose; Mother was trying to engage with the minors more; and Mother had stated that when she wrote in her journal, "'This is not me writing, sometimes people speak to me.'" Bellamy was concerned that the minors were "exposed" to Mother's behavior.

5

On January 7, 2013, Mother's therapist reported that Mother "presents with symptoms that appear to meet criteria for a provisional diagnosis of Schizoaffective Disorder that include . . . paranoia, mood disturbance, delusions and hallucinations."

On January 30, 2013, Father filed a "Walk-On Request," asking for an order restricting Mother's visits and an order requiring her to vacate the family home. Father stated that on January 21, 2013, Mother had been put on a 14-day involuntary hold because she had stopped taking her prescribed medication and became delusional; Father had temporarily moved out of the family home with the minors to protect them from Mother; and Father believed that Mother posed a risk of harm to the minors.

DCFS filed an ex parte application and order pursuant to section 385, stating that on January 17, 2013, DCFS received a telephone call from Bellamy, who reported that "[M]other was acting very bizarre, . . . [M]other was very agitated and was claiming that she is Jesus and Obama was her lover and speaks to her. Mother was acting very delusional and was not taking her medication."[2] DCFS reported that Father had been advised by Bellamy to sleep in the bedroom with the minors and keep the door locked. On January 25, 2013, DCFS reported that Mother would not be discharged until at least February 6, 2013, her "psychological condition had decompensated greatly, and . . . [she] had refused medication, until only recently."

On February 5, 2013, DCFS's section 385 petition was heard. Mother was not present. The juvenile court ordered the minors detained from Mother's custody, monitored visits for Mother, and that Father, or someone that he approved of, could monitor the visits, which were to occur in a public place.

On February 15, 2013, the date of the adjudication hearing, Mother requested to represent herself and waived her right to counsel. After questioning her, the juvenile court accepted her waiver. The court entered into evidence DCFS documents, including

---

[2] Section 385 provides, "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article."

the detention report, the jurisdiction/disposition report, letters from Mother's mental health providers, the section 385 petition, and a last-minute information report. The court also took judicial notice of its prior findings and orders. DCFS, Mother, counsel for Father and counsel for the minors stated they were not presenting any evidence. Mother made her closing argument, sometimes referring to herself in the third person, stating that President Obama had chosen her to represent herself, she "has never been mentally ill," and "she has been misdiagnosed for eight years, and I'm doing this to try to protect her." She stated, "I have chosen this woman because she is respectful. . . . [¶] . . . Other people know that I am representing them today, that is, all of the people who are sitting in the lobby outside." She argued that "God believes in me, and that is why Obama is going to call right now and tell you that this woman is telling the truth. And the truth is she is not psychotic. She is not schizophrenic. She is not bipolar. She is not schizoaffective, and she's not even delusional." She stated, "And now it's my turn to contact you, the judge, to tell you that I am President Obama, and I speak through Caroline [G.], and she is a woman of honor, and she is a woman crying in front of you because her children were taken away from her because people thought she was psychotic, and it is the furthest from the truth because this woman is a professional woman who has worked hard all of her life."

The juvenile court asked Mother, "When you stated that you are Obama speaking now through Ms. [G.], are you using that as a metaphor, or should I take that to be that those are President Obama's words just through your physical body?" Mother replied, "I am a medium, and people speak through me, including President Obama. He speaks through me because I am the chosen one, and people chose me to do this. And I didn't choose it. Someone chose it for me."

DCFS, Father's counsel, and the minors' counsel submitted on the evidence. The juvenile court found there was a factual basis for finding that the minors were described by section 300, subdivision (b) but amended the petition to strike the phrase "*suicidal ideation and suicidal attempt.*" As amended and sustained, the petition alleged under section 300, subdivision (b) that "[Mother] has mental and emotional problems, including

7

a diagnosis of schizophrenia and symptoms of delusional behavior [and] auditory hallucinations with poor insight into her mental illness, which render [Mother] incapable of providing regular care of the [minors]. In August of 2012, [Mother] was involuntarily hospitalized for the evaluation and treatment of [Mother's] psychiatric condition. In September of 2012, [Mother] was hospitalized for the evaluation and treatment of [Mother's] psychiatric condition. On prior occasions in 2012, [Mother] failed to take [Mother's] psychotropic medication, as prescribed. Such mental and emotional problems on the part of [Mother] endanger the [minors'] physical health and safety and places the [minors] at risk of physical harm . . . and danger."

The juvenile court observed that all of the statements from Mother's mental health providers disagreed with Mother's statement that she was misdiagnosed, and that her statements in court that President Obama was speaking through her supported the conclusions of those providers.

At disposition, Mother urged that she had never mistreated the minors, she was a professional, she wanted a second chance, she has taken her medication, and she had been misdiagnosed for eight years. Father's counsel asked the juvenile court to terminate the dependency case with a family law order giving Father sole custody of the minors. The minors' counsel joined in Father's request. DCFS requested family maintenance services for Father.

The juvenile court declared the minors dependents of the court and ordered them removed from Mother, stating, "I now find by clear and convincing evidence substantial danger exists to the [minors], and there is no reasonable means to protect them without removing them from [Mother's] custody." The court ordered Father to have sole legal and physical custody of the minors and terminated juvenile court jurisdiction, stating, "There's no evidence these [minors] are at risk in [Father's] custody." The court ordered monitored visits for Mother. The custody order was ordered filed in the family court. Mother filed a notice of appeal from the court's orders and later filed an amended notice of appeal.

8

## A. Standard of review

The juvenile court's jurisdictional finding that the minors are persons described in section 300 must be supported by a preponderance of the evidence. (§ 355; Cal. Rules of Court, rule 5.684(f).) ""When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.)

## B. The juvenile court erred in sustaining a petition that alleged only that Mother is mentally ill and is unable to care for the minors where Father has always been, and is, capable of properly caring for them

Mother contends the evidence was insufficient to support the juvenile court's jurisdictional order under section 300, subdivision (b). We conclude that the court erred in sustaining a petition that alleged only that Mother is mentally ill and is unable to care for the minors where Father has always been, and is, capable of properly caring for them.

Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

9

"A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness."' [Citation.]' [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Regarding Mother's mental illness, the evidence shows that seven or eight years before DCFS became involved, Mother started having auditory hallucinations and delusional thinking. Her condition worsened when she stopped taking medication, and from that time Mother continuously has been "experiencing conversations." Mother presented with "symptoms that appear to meet criteria for a provisional diagnosis of Schizoaffective Disorder that include . . . paranoia, mood disturbance, delusions and hallucinations." In August 2012, after obeying voices that told her to lie down in the street and run through the sprinklers, she was hospitalized as a threat to herself and others. After the dependency action was initiated, Mother either refused to take her medication or modified the dosage, denying that she had a mental illness. Further, Mother was not "able to develop a loving maternal bond with" the minors and in the presence of the minors, Mother had attempted to stuff a piece of paper down Father's throat, saying he was a "'monster.'" Mother was reported to be in "her own world and during these times she totally detaches herself from her surroundings, even from her children." After discontinuing her medication, Mother "recently became very psychotic with poor insight and judgment." Mother's representation of herself at the adjudication hearing, during which she sometimes referred to herself in the third person, claiming that President Obama had chosen her to represent herself, and claiming to be President Obama, did nothing to advance her argument that she had never been and was not mentally ill.

That Mother is mentally ill is not the end of the story because DCFS "has the burden of showing specifically how the minors have been or will be harmed and harm

10

may not be presumed from the mere fact of mental illness of a parent." (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) Although the evidence supported the finding that Mother was unable to provide regular care for the minors due to her mental illness, Father has shown remarkable dedication to the minors and that he is able to protect them from any harm from Mother's mental illness. Father ensured that there was adult supervision, other than Mother, of the minors at all times. Father or the nanny were the minors' primary caregivers, while Mother usually stayed in her room. As stated, Mother had been left alone with the minors on one occasion, and no harm to them had been reported. Father slept in the bedroom with the minors and kept the door locked pursuant to the advice of the in-home counselor and temporarily moved out of the house with the minors to protect them from Mother.

*In re Phoenix B.* (1990) 218 Cal.App.3d 787 is illustrative. There, the minor was detained when the mother was hospitalized involuntarily after suffering a mental breakdown. The mother and father were married, but living separately. When the father came forward, the minor was released to his care. The department of social services reported that the mother denied that she needed therapy and asked inappropriate questions about the minor. And the mother needed to complete therapy and would have to be closely supervised and complete parent education classes in order for the minor to be returned to her. The father, on the other hand, was compliant with the department and cared appropriately for the minor. In upholding the juvenile court's dismissal of dependency proceedings, the appellate court noted that dependency may be sustained where there is only one "offending parent" if the department "can still make a prima facie case under section 300 when only one parent has created the conditions suggesting the need for dependency proceedings." (*Id*. at pp. 792–793.) But where the father provided appropriate care and the minor's welfare was not endangered by placing her with the father, there was no basis for assuming dependency jurisdiction. (*Id*. at p. 793.) The appellate court held that the juvenile court properly dismissed dependency proceedings after the department determined that the father "was willing and able to provide for her

11

care" (*id.* at p. 792) and that the mother's remedy was to assert her custody rights in family court (*id*. at pp. 794–795).

Mother relies on *In re James R*., *supra*, 176 Cal.App.4th 129, in support of her argument that any causal relation between Mother's mental state and harm to the minors is speculative. In that case, the appellate court held that because there was no evidence of actual harm to the minors from the mother's conduct or evidence that the parents were unable to provide care for them, any causal link between the mother's mental state and future harm to the minors was speculative. (*Id*. at p. 136.) Although this case is distinguishable from *In re James R*. because here, Mother's mental state was such that she was incapable of caring for the minors, it is similar in that there is no doubt that Father could ensure the minors' safety.

In *In re David M*. (2005) 134 Cal.App.4th 822, also relied on by Mother, the appellate court held that the social services agency had failed to show "evidence of a specific, defined risk of harm to [the minors] resulting from mother's or father's mental illness . . . ." (*Id*. at p. 830.) "The evidence was uncontradicted that [the minor] was healthy, well cared for, and loved, and that mother and father were raising him in a clean, tidy home. Whatever mother's and father's mental problems might be, there was no evidence those problems impacted their ability to provide a decent home for [the minor]." (*Ibid*.) Here, while Mother is mentally ill, which impacts her ability to care for the minors, Father's ability to protect the minors and to provide a decent home for them has not been questioned.

*In re Kristin H*. (1996) 46 Cal.App.4th 1635, cited by DCFS for the proposition that the juvenile court properly asserted jurisdiction over the minors, is also distinguishable. In that case, the mother refused to take her psychotropic medication, succumbed to severe anxiety attacks, neglected to care for the minor, and ingested illegal drugs which were accessible by the minor. (*Id*. at pp. 1643, 1653.) Here, on the other hand, there was always a responsible adult present to care for the minors, save on one occasion where no harm came to the minors.

*In re John W.* (1996) 41 Cal.App.4th 961, superseded on other grounds by statute as noted in *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 102–103, is instructive. In *John W.*, a bitter child custody case became a juvenile dependency case by virtue of unproved allegations of child molestation. After more than a year in the juvenile dependency system, during which there was no finding of abuse, the juvenile court terminated its jurisdiction over the minor but split physical custody between the parents. Both the mother and the father appealed from the orders of the juvenile court. The appellate court remanded the matter "to the *family court* where this case should have been all along." (*Id.* at p. 965.) The appellate court stated: "The juvenile courts must not become a battleground by which family law war is waged by other means. It is common knowledge that the resources of local government social service agencies are stretched thin; in the juvenile dependency context those resources are manifestly intended to be directed at neglected and genuinely abused children." (*Id.* at p. 975.) The court noted, "If indeed there is ever a place for it, the place for a custody battle is in the family law courts. There the battle will not consume public resources which are better directed to children who typically do not have the luxury of two functional parents fighting for custody, and where the taxpayers do not have to pick up the tab for lawyers and psychologists." (*Id.* at p. 976, fn. omitted.)

While the facts before us are different from those of *In re John W.*, and we mean no criticism of Mother and Father, the wisdom to be gleaned from *John W.* is that matters such as this one belong in family court, where it ultimately ended up after the juvenile court determined the minors were not at risk in Father's custody and awarded Father custody and Mother monitored visitation. As the appellate court did in *In re John W.*, we remand the matter to the family court.

Accordingly, we conclude that the juvenile court erred in sustaining a petition that alleged only that Mother is mentally ill and is unable to care for the minors where Father has always been, and is, capable of properly caring for them. At the adjudication hearing, the juvenile court should have dismissed the petition, staying the order until Father obtained from the family court an award of custody to him and monitored visitation to

13

Mother.  Therefore, we reverse the jurisdictional and dispositional orders of the juvenile court and remand the matter to the family court for a hearing on the custody and visitation issue.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders and judgment are reversed.  The matter is remanded to the family court for a hearing on the custody and visitation issue.

CERTIFIED FOR PUBLICATION.


MALLANO, P. J.

We concur:


CHANEY, J.


JOHNSON, J.

14