Filed 12/14/15  In re A.D. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.D., et al., Persons Coming Under the Juvenile Court Law. | B262536 |
| COUNTY OF LOS ANGELES DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ANNA D.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK05289) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debra L. Losnick, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

Anna D. (mother) appeals from the juvenile court's jurisdictional findings that she failed to protect her children, A.D. (born in January 2002) and Alanna D. (born in September 2003), from her boyfriend's sexual abuse. She argues the court erred in exercising jurisdiction over the children under Welfare and Institutions Code[1] section 300, subdivision (d), because insufficient evidence supports the court's findings that she knew or should have known about the sexual abuse and, in any event, they were safe in their father's custody at the time of the jurisdiction hearing. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.      Initial Referral and Sexual Abuse Investigation**

Under a May 2013 family court order, mother and Albert D. (father) shared legal and physical custody of A.D. and Alanna. Father had primary physical custody of the children, while mother saw them on certain days of the month. When the children were in mother's physical custody, they stayed with her and her boyfriend, R., at R.'s house. Mother would sometimes travel by herself, leaving the children alone with R. for several days. Mother did not tell father, and she instructed the children not to tell father, when she would leave the children alone with R.

In April 2014, the Department of Children and Family Services (the Department) received a referral alleging that R. had sexually abused A.D. and Alanna. After the Department received the referral, the children were interviewed by law enforcement, medical personnel, and Department staff.

Alanna described an incident from September 2013, when R. molested her while mother was in Thailand. She was watching cartoons with R. on mother's bed when he grabbed her and touched her vagina with his hand and penis. Alanna claimed this was the only time R. abused her. A.D. reported that R. had sexually abused her several times since she was around five or six years old. R. would sometimes touch her breasts,

---

[1]      All undesignated statutory references are to the Welfare and Institutions Code.

vagina, and buttocks. The children denied telling anyone, including mother, about R.'s sexual abuse before the referral was made.

After receiving the referral, the Department's social worker interviewed father and mother. Before the abuse was reported, father had not been concerned about the children's safety when they were around R., but he was aware that mother would sometimes leave them alone with R. for several days at a time. He claimed, however, that he never knew when mother left the children alone with R. until after the children returned to his custody.

Mother claimed that father had "coached" the children to make false allegations against R., and she accused father of being an alcoholic and having committed domestic violence and rape in the past. Mother reported that she was completely dependent on R. as her caretaker.

Shortly after the referral was made, father obtained an emergency custody order from the family court, temporarily awarding him full physical custody of the children. Mother opposed father's request for the temporary order, denying that R. had abused the children and requesting that R. be allowed to remain in contact with them. Several days later, the Department's social worker questioned mother about her response to father's request for full custody of the children. Mother continued to deny that R. had sexually abused her children, saying that she had seen no "paperwork" about the children's allegations.

## 2. The Petition and Detention

In June 2014, the Department filed a dependency petition, alleging that the children fell within the court's jurisdiction under section 300, subdivisions (b), (d), and (j), based on R.'s sexual abuse of the children and mother's failure to protect them from the sexual abuse.[2] Father was not named in the petition. At the detention hearing, the court found the Department established a prima facie case that the children fell within

---

[2] The petition set forth six allegations. Specifically, for each of the three subdivisions of section 300 under which the Department sought to establish jurisdiction, the Department made two allegations, one as to each child.

the court's jurisdiction and ordered the children removed from mother's custody and placed with father. The court allowed mother monitored visits with the children in a therapeutic setting and ordered R. not to contact the children.

### 3. The July 2014 Interviews

In July 2014, the Department's social worker conducted additional interviews with mother, father, and the children.

#### i. Mother's Interview

Mother appeared confused during her interview, telling the Department's social worker that she did not understand why the children had been removed from her custody. When asked about Alanna's allegations against R., mother stated, " 'Alanna told me that someone was touching her inappropriately but said she couldn't tell me because daddy would be mad. . . . I looked in the area [vaginal area] and there were little pimples. She told me before I left to Thailand.' " When asked about A.D.'s allegations, mother casually dismissed them, laughing and saying, " '[A.D.], good luck if you can get close, she will kick your butt.' "

Mother continued to deny R. had sexually abused her children, saying, " 'He [R.] is so respectful. I have been with him every day for the last 10 years, except when I went to Thailand. I never seen him [R.] get that close to her [Alanna]. We have a dog; he is protective of the girls. He [the dog] would know if something is wrong. . . . I am not denying that somebody is touching my daughter. . . . [¶] He [R.] said he didn't do it. I do believe him. I am with him. He is a good man.' " She told the social worker that she thinks her children are " 'scared and confused,' " and she attributed A.D.'s allegations to the fact that she is "outspoken." Mother did report, however, that she had observed the children engaging in "sexualized" behavior. For example, she told the social worker that she caught Alanna taking photographs of A.D.'s buttocks, that Alanna had kicked or hit someone in the genitals, and that A.D. "tears up" her room when she gets mad.

#### ii. A.D.'s Interview

A.D. told the social worker that R. abused her when she was between four and 10 or 11 years old. She said that when she was " 'smaller,' " he would penetrate her vagina

with his penis. He would also touch her private parts with his hand and make her touch his private parts. R. would sometimes enter A.D.'s bedroom in the middle of the night and get into bed with her while everyone else in the house was sleeping.

A.D. told the social worker, " 'I feel safe at my dad's house. I mean I love my mom but I don't want her to live with [R.] because I worry for my mom. . . . I don't think my mom believes me [referring to the sexual abuse] cuz she doesn't do anything to change it.' " A.D. said that she would cry every Thursday when she had to go to R.'s house. Although A.D. denied ever telling mother about R.'s abuse, she did on at least one occasion repeatedly tell mother that she hated R.

### iii. Alanna's Interview

Alanna told the social worker that she "sometimes" feels safe with R. When asked about when she does not feel safe, Alanna said, " 'When my mom went to Thailand and she went to Vegas for a couple of days.' " Alanna then described the September 2013 incident when R. sexually abused her. Alanna told the social worker that she thought mother did not believe that R. had abused her and A.D.

### iv. Father's Interview

Father again denied he was aware R. had sexually abused the children before the abuse was reported. He did notice, however, that the children would often become anxious before going to R.'s house. Father assured the social worker that the children would be safe in his care and that he would provide any support and treatment they needed.

### 4. Post-Detention Events

After the detention hearing, mother continued to live with R. Between June and August 2014, mother failed to show up for two monitored visits with the children. A third visit was scheduled for late September 2014; however, the children refused to visit with mother because they did not think she believed them about the sexual abuse allegations and they were upset that she continued to be in a relationship with R. In August 2014, mother went with R. to the children's former middle school to try to contact the children.

5

In December 2014, the Department reported that mother had started visiting the children on a weekly basis. The children were becoming more affectionate toward mother, expressing their feelings and telling her they loved her.

On January 9, 2015, the Department contacted mother's therapist, who reported that mother was still living with R. The therapist believed mother was unable to comprehend the severity of the children's allegations or understand why she should not continue to live with R.

### 5.     Jurisdiction and Disposition Hearing

On January 14, 2015, the court held a jurisdiction and disposition hearing. After receiving evidence from the Department and hearing argument from counsel, the court sustained the petition's two allegations under section 300, subdivision (d), finding that R. had sexually abused Alanna and A.D., and that mother should have known about the abuse but failed to protect her children from it.[3] The court then terminated jurisdiction and issued a family law exit order, granting father sole legal and physical custody of the children, awarding mother monitored visitation with the children two times a month, and prohibiting R. from going within 500 yards of the children.

## DISCUSSION

Mother challenges the court's jurisdictional order on two grounds. First, she argues insufficient evidence supports the court's findings that she failed to protect A.D. and Alanna from R.'s sexual abuse. Second, she contends that, even if the court's jurisdictional findings are supported by substantial evidence, the court should have dismissed the dependency petition because A.D. and Alanna were safely in father's custody at the time of the jurisdiction hearing.

### 1.     Applicable Law and Standard of Review

Under section 300, subdivision (d), a juvenile court may exercise jurisdiction over a child when the "child has been sexually abused, or there is a substantial risk that the

---

[3]     The court dismissed the four allegations under subdivisions (b) and (j) in the interests of justice.

child will be sexually abused . . . by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." To support a jurisdictional finding, the sexual abuse does not have to be performed by the child's parent; rather it is sufficient to establish jurisdiction if the abuse has been carried out by a member of the child's household. (See § 300, subd. (d).) A " 'member of the household' " is "any person continually or frequently found in the same household as the child." (Cal. Rules of Court, rule 5.502, subd. (22).)

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) We will affirm the finding if it is supported by evidence that is reasonable, credible, and of solid value. (*Ibid.*) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*Ibid.*) We can affirm jurisdiction if any one of the grounds alleged in the dependency petition is supported by substantial evidence. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)

**2.      The Jurisdictional Findings Are Supported by Substantial Evidence**

On appeal, mother argues that insufficient evidence supports the court's findings that she knew or reasonably should have known that both children were in danger of being sexually abused by R. Notably, mother does not challenge the court's finding that R. sexually abused Alanna and A.D while they were in her physical custody. As we discuss below, substantial evidence supports the court's findings.

A.D. reported to the Department that R., who lived with mother, had sexually abused her over the course of several years. According to A.D., R. would sometimes leave his and mother's bedroom in the middle of the night and get into bed with A.D.

7

Eventually, A.D. began to actively avoid contact with R., and on at least one occasion, she told mother that she hated R. Nevertheless, mother made no effort to learn why A.D. hated R. or why she avoided contact with him. Instead, mother ignored A.D.'s feelings toward R. by frequently leaving her and Alanna alone in R.'s care for extended periods of time. A.D.'s and R.'s behavior should have caused mother to become suspicious that A.D. was being abused. (See *In re Maria R.* (2010) 185 Cal.App.4th 48, 60 [mother should have been aware of father sexually abusing their children because the abuse had been ongoing for several years] disapproved of on other grounds in *In re I.J.* (2013) 56 Cal.4th 766.)

As for Alanna, she told mother that someone had inappropriately touched her before mother went to Thailand. Mother also reported that she had seen Alanna engage in sexualized behavior. Although mother claimed she checked Alanna's genitals for signs of abuse, she made no further effort to determine whether Alanna actually had been abused and, if so, by whom. For example, she never reported Alanna's statement to law enforcement or sought to have Alanna examined by a medical professional.

### 3. Jurisdiction was Proper Even Though the Children Lived with Father

Next, mother contends that even if substantial evidence supports the court's finding that she should have known about R.'s sexual abuse, the court erred in sustaining jurisdiction over the children because the Department did not prove the children faced a current risk of harm at the time of the jurisdiction hearing. Specifically, mother relies on *In re A.G.* (2013) 220 Cal.App.4th 675 (*A.G.*) to argue the court should have dismissed the dependency petition because, at the time of the jurisdiction hearing, the children were safe in father's custody and did not face a risk of further sexual abuse. Mother also argues the court's jurisdictional findings were futile because the court terminated jurisdiction and granted father sole legal and physical custody of the children immediately after making its jurisdictional findings. We disagree with mother's contentions.

*A.G.* does not support mother's claim because the juvenile court in this case sustained jurisdiction over the children under section 300, subdivision (d), not

8

subdivision (b). Unlike subdivision (b) which was at issue in *A.G.*, (see *A.G., supra,* 220 Cal.App.4th at p. 683.) subdivision (d) of section 300 does not require a showing in every case that a child faces a risk of harm (i.e., sexual abuse) at the time of the jurisdiction hearing. (See *In re Carlos T.* (2009) 174 Cal.App.4th 795, 803 (*Carlos T.*).) Rather, it is sufficient to show that the child has been sexually abused by a parent or a member of the household, or a parent failed to protect the child from sexual abuse when the parent reasonably should have known that the child was in danger of being abused. (See *id.* at p. 805 [if there is substantial evidence that the child was actually abused, "there is no need to discuss whether there was sufficient evidence to support jurisdiction under the *alternative* 'substantial risk' of abuse prong of subdivision (d)"], italics original.) Accordingly, *A.G.* does not stand for the proposition that jurisdiction cannot be sustained under section 300, subdivision (d), if a child who was sexually abused in the past is safely residing with a nonoffending parent at the time of the jurisdictional hearing.[4]

*A.G.* is also distinguishable on its facts. *A.G.* did not involve sexual abuse, or any type of abuse, against children. (See *A.G.*, *supra*, 220 Cal.App.4th at pp. 677-682.) Unlike the children in *A.G.*, A.D. and Alanna did not have a parent who at all times protected them from suffering actual abuse or harm. Although the parties do not dispute the children were safe when they were in father's custody, the children were seriously harmed when they were not in his custody--they were sexually abused by mother's boyfriend. We also note that father would allow the children to go to R.'s house despite

---

[4]    This case also does not fall within the scope of *In re Phoenix B.* (1990) 218 Cal.App.3d 787, a case mother cites for the proposition that there is "no basis for dependency jurisdiction where [a] nonoffending father provided appropriate care and the [children's] welfare was not endangered by placing [them] with father." In *Phoenix B.*, the Court of Appeal affirmed the juvenile court's dismissal of a dependency petition alleging jurisdiction under former section 300, subdivision (a), after the child's noncustodial, nonoffending father, who lived out of state, appeared in the dependency proceeding and claimed custody of the child. (*Id.* at pp. 790, 792-794.) Here, the children remained within the scope of section 300, subdivision (d), even after they were placed in father's sole physical custody.

9

having reason to be concerned about their safety and wellbeing when around R. For example, A.D. and Alanna would become anxious and sometimes cry before going to R.'s house.

We also reject mother's argument that the juvenile court's jurisdictional findings were futile because the family court could have issued a custody order awarding father sole legal and physical custody of the children without the juvenile court's intervention. Mother's argument ignores the fact that juvenile and family courts serve different purposes, even though some of their functions may overlap. (See *In re Chantal S.* (1996) 13 Cal.4th 196, 201.) One of the most critical distinctions between the two courts is that in the family court, parents are presumed to be "fit and capable of raising their children," whereas such a presumption does not exist in the juvenile court. (*Ibid.*) While the family court is designed to provide presumably fit parents with a forum to resolve their private custody disputes (*ibid.*), the juvenile court and the dependency statutory scheme is designed to "restrict parental behavior regarding children" and "provide maximum safety and protection" for children who have been neglected or sexually, physically, or emotionally abused. (§ 300.2; see also *Chantal S.*, *supra*, 13 Cal.4th at p. 201.)

In this case, the juvenile's court's exercise of jurisdiction over the children was appropriate in light of the sexual abuse they suffered and mother's continuing lack of concern for their physical and emotional wellbeing. Indeed, mother denied R. was responsible for the children's abuse and tried to shift the blame for the abuse to other people, including father. Aside from failing to take responsibility for the harm her children suffered, mother displayed a lack of concern for their safety by leaving them alone in R.'s custody for extended periods of time. Even after the juvenile court issued an order prohibiting R. from contacting the children, mother and R. went to the children's school in an attempt to contact them. If not for the Department's and the court's intervention, it is unlikely mother would have addressed, let alone acknowledged, the sexual abuse that gave rise to these dependency proceedings. (See *Carlos T.*, *supra*, 174 Cal.App.4th at pp. 800, 806.)

10

## DISPOSITION

The jurisdictional findings and judgment are affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:



EDMON, P. J.



ALDRICH, J.