Filed 1/20/26  In re Gwendolyn B. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re GWENDOLYN B., a Person Coming Under the Juvenile Court Law. | B345669 (Los Angeles County Super. Ct. No. 24CCJP03543) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSEPH B., Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

Joseph B. (father) appeals from a judgment of the juvenile court asserting jurisdiction over his daughter Gwendolyn B. (born November 2011). Father requests reversal of the jurisdictional findings against him and argues the court should have terminated jurisdiction after granting him custody. Finding no error, we affirm the judgment and dispositional order maintaining jurisdiction over Gwendolyn.

## FACTUAL AND PROCEDURAL BACKGROUND
**The family**

K.P. (mother) had three children: Gwendolyn, Amora (born February 2021), and Luna (born March 2022 and deceased November 2024.) Vincent A. is the father of Amora and Luna.[1] Father and mother lived separately, and father did not see Gwendolyn regularly.[2]

The family had a prior referral to the Los Angeles County Department of Children and Family Services (DCFS) when, in February 2021, mother was reported to be an alcoholic and tested positive for alcohol and marijuana after giving birth to Amora. During an investigation, it was determined mother tested positive only for marijuana, not alcohol, and Amora tested negative for all substances. The referral was closed as inconclusive.

---

[1] Mother and Vincent A. are not parties to this appeal. This appeal only concerns Gwendolyn. Her half siblings are mentioned as necessary.

[2] Father had a criminal history including arrests and convictions for possession of narcotics for sale, burglary, assault with a deadly weapon, possession of drug paraphernalia, grand theft auto, battery, vandalism, a bench warrant for failure to appear, and a bench warrant for violation of parole.

## Investigation

On November 6, 2024, DCFS received a referral alleging severe neglect of Gwendolyn, Amora and Luna. The reporting party stated a 911 call was made when Luna was not breathing. Luna was transported to the hospital but was in critical condition due to extreme malnourishment. She was extremely small and unkempt, appearing as "skin and bones" with loose, saggy skin because there was no fat or muscle on her. Paramedics lost Luna's heartbeat on the way to the hospital. She was not expected to survive.

A DCFS social worker met with mother, Gwendolyn, and Amora at a police station. A hospital social worker called the DCFS social worker and discussed the need to speak with mother about end-of-life decisions for Luna. The message was relayed to mother, who consented to the hospital keeping Luna comfortable until she passed away.

Gwendolyn spoke to a forensic interviewer at the police station, reporting that when she woke up, she saw mother throwing up. She found this normal because mother had been sick. Mother asked Gwendolyn to get a blanket and pillows. While she gathered the items, Gwendolyn noticed Luna looked "stiff" and was not moving. Later, Gwendolyn saw mother holding Luna, who was not crying or moving. In response to Gwendolyn's inquiry if Luna was okay, mother said she was. Gwendolyn went back to sleep but was wakened by mother screaming that Luna was not breathing. Gwendolyn then called the police.

Gwendolyn had nothing to eat that morning. The previous day, she had a corn dog and made a hot dog for Amora.

Gwendolyn said she or Ms. W. (a roommate) helped mother care for Luna.[3]  When Gwendolyn tried to feed Luna, she would not eat.  Although Luna was two years and six months old, she only breastfed.

Gwendolyn reported being homeschooled, but she had no assignments or schoolwork.  She had not been to school since fourth grade.  When Gwendolyn was nine or 11 years old, she passed out and went to a doctor because she had not eaten anything.

Gwendolyn stated mother is often sick and throws up frequently.  She started throwing up a lot after giving birth to Amora.  Mother told Gwendolyn she drinks alcohol because she is an alcoholic, and if she stopped, she would get sick.  Mother acted normally after drinking and continued to breastfeed Luna while drinking.

At the time of the incident, Gwendolyn reported she had not seen her father in over a year.  She reported being afraid of father because of an incident a year prior when an adult half sibling banged on the door to pick her up for a visit with her father.

The social worker spoke to a doctor at the hospital, who said Luna's organs were failing, the condition appeared to be caused by starvation, and it was just a matter of time before Luna would pass away.  In the early morning hours of November 7, the social worker spoke to another doctor, Dr. Ascencio, who also reported Luna was severely malnourished

---

[3]     Mother and Ms. W. were the subject of a 2022 physical abuse referral for another child and were subject to an ongoing police investigation regarding child abuse with great bodily injury for the incident.

and dehydrated.  Mother had told Dr. Ascencio she had taken Luna to the doctor many times and was told Luna was fine. Dr. Ascencio did not believe mother as she could not provide the names or locations of the doctors.  Given Luna's condition, it was believed she had been malnourished and neglected for weeks.  On November 7, 2024, at 12:39 a.m., Luna died.

A detective spoke with Ms. W., who said mother chose alcohol over caring for her children, and the family had struggled to obtain food.  Paramedics had come to the home about a month earlier, and mother told Gwendolyn to hide Luna from them.  A neighbor noticed Luna appearing very thin.

Mother said Luna could stand but could not walk, and Luna preferred to be carried because she was "spoiled."  Mother tried to feed Luna, but she spit out the food.  Luna had stopped eating when she turned two years old, and mother did not know why.  She thought Luna was not interested in eating because she was teething. Mother said a doctor told her Luna was fine in October 2024, but she could not provide the name or location of the doctor.

Mother had no contact with father for over a year.  Their relationship had been abusive.  Mother did not have father's contact information.

Mother admitted she drank alcohol.  She claimed to have stopped drinking for a while but started again when Luna was a year old.  Mother drank a bottle of liquor every two or three days by herself.  Mother said she was told she could not stop drinking right away, she had to stop little by little.  When asked about her missing a few teeth, mother said both father and Vincent A. punched her in the mouth.  Mother expressed suicidal thoughts to the social worker, and a corrections officer ended the interview.

Mother stated if she knew she should not drink alcohol and breastfeed, she would not have done so.

**Dependency petition and detention**

DCFS filed a petition pursuant to Welfare and Institutions Code section 300 alleging mother severely neglected Luna, causing her death and placing Gwendolyn and Amora at risk of serious harm under subdivisions (b)(1), (f), and (j).[4]  The petition further alleged mother's abuse of alcohol and unresolved mental health issues placed the children at risk of harm.  The petition indicated DCFS would be relying on section 355.1, subdivision (a) to assert that a rebuttable presumption exists finding the children were described by section 300, subdivisions (a), (b), or (d).[5]

On November 12 and 14, 2024, the juvenile court temporarily detained Gwendolyn from her parents, ordered monitored visits with mother, a due diligence search for father, limited mother's educational rights, and ordered grief counseling for Gwendolyn.

**Investigation**

Gwendolyn said father had not been a "good dad" and did not spend time with her.  When they did spend time together,

---

[4]     All further undesignated statutory references are to the Welfare and Institutions Code.

[5]     Section 355.1, subdivision (a), provides: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of section 300."

father made Gwendolyn do construction work that she did not like. Gwendolyn said mother did not speak to father because father beat mother when mother was pregnant with her. Mother and Ms. W. had informed Gwendolyn of the domestic violence.

The social worker attempted to speak with Amora but had trouble understanding what the child was saying.

DCFS located father, who said he had not spoken to Gwendolyn in "a while" because when he went to the family home to check on Gwendolyn, Ms. W. blocked father and shouted at him. Father sent his adult son to the home three weeks earlier to check on Gwendolyn, and Ms. W. screamed at his son to leave. Father said he stopped going because every time he did they screamed at him and refused to let him in the house. Father's adult daughter also attempted to go to the home to see Gwendolyn but was rebuffed. Father was concerned about the lack of medical and dental care provided to Gwendolyn.

When the social worker read the substance abuse count to father, he acknowledged mother had a drinking problem but stated she "toned it down to just doing weed" the last he knew. He claimed to be unaware that her alcohol abuse had worsened. Father speculated this was why mother was adamant that no one go to the house.

Father said he knew mother was not taking care of the children and "Gwendolyn was the one feeding the kids all the time." Father said Gwendolyn knew how to make Top Ramen, her favorite food, and she did not go to a doctor or a dentist.

Father last heard from mother about four months prior and had seen the younger children about nine months earlier and did not notice anything wrong. Father last saw Gwendolyn in June, July, or August 2024. When he was last in mother's home, it was clean, and he believed there was food for Gwendolyn because she

7

"gets her own money" by receiving food stamps and child support. Father could not understand how Luna was malnourished because Gwendolyn was the one taking care of the younger children. Father denied hitting mother and said Vincent A. was the one who hit her.

Father stated he loved his daughter, but he did not want physical custody of Gwendolyn. Father preferred his sister, Vanessa, for placement. Pending adjudication, father contacted Gwendolyn's caregiver to attempt to speak to Gwendolyn, but she refused to speak to father.

DCFS obtained Gwendolyn's school records, which showed she was last enrolled in first grade from 2018 to 2019. With DCFS's assistance, Gwendolyn was enrolled in seventh grade. Father said he was unaware Gwendolyn was not enrolled in school because mother told father Gwendolyn skipped several grades.

Vincent A. acknowledged mother "wasn't feeding the baby[;] she was not feeding herself and then trying to feed the baby on her body[,] which was full of alcohol." Vincent A. said he was trying to "get rights for Gwendolyn" because father did not come to see Gwendolyn often, only "every blue moon." Vincent A. said he had last seen Luna when she had just turned one year old. She was underweight and skinny. Vincent A. told mother to stop drinking and breastfeeding the baby. Vincent A. also said mother smacked Gwendolyn's face.

The emergency response social worker spoke to Ms. W., who said mother had "killed that baby," and Luna had been malnourished for a year. Ms. W. said it was over a year since Luna had eaten anything, walked, or crawled. Ms. W. speculated mother was so drunk all the time she probably did not even

8

notice. Mother "would buy a fifth of tequila in the morning[,] and by the afternoon it would be gone."

Father made his first appearance at a trial setting conference in December 2024. Father's counsel requested Gwendolyn's placement with him or unmonitored visits. DCFS was ordered to assess father for placement or unmonitored visits.

**Amended petition and further investigation**

DCFS filed a first amended petition on January 14, 2025, which added allegations that Vincent A. knew or reasonably should have known of mother's severe neglect of the children, and both Vincent A. and father knew of mother's substance abuse and mental health problems and failed to protect the children. The first amended petition also alleged Vincent A. and father engaged in domestic violence with mother, which placed the children at risk.[6]

At a January 15, 2025 trial setting conference, father's counsel waived reading of the first amended petition and entered a general denial. Father requested placement of Gwendolyn with her adult sibling. The court stated DCFS would continue to reach out to the adult sibling.

By January 2025, Gwendolyn was open to having phone visits with father, but she continued to refuse in-person visits with him. By February, father began having monitored visits with Gwendolyn twice per week. Father's first unmonitored visits with Gwendolyn took place in March 2025 and went well.

---

[6] The first amended petition did not include notice that had been included in the original petition indicating DCFS would proceed pursuant to section 355.1. The record shows the juvenile court did not proceed under that statute as to father. Therefore, we decline to address father's argument that if section 355.1 was applied to father, due process was violated.

Father was concerned that mother had influenced Gwendolyn to be wary of having a relationship with him. DCFS recommended father and Gwendolyn participate in family counseling and asked the juvenile court to detain Gwendolyn from father and order family reunification services.

**Adjudication hearing**

The adjudication hearing took place on March 20, 2025. Counsel for the children argued the first amended petition should be sustained as pled. As to father, the children's counsel argued he failed to protect Gwendolyn because he was aware of mother's issues and knew Gwendolyn was taking care of her younger siblings. Counsel noted mother's history of alcohol abuse was longstanding and known by people around her.

Counsel for father asked that father be dismissed from the petition because mother alienated him from Gwendolyn. Counsel argued father did not have the means or legal knowledge to pursue a family law case to secure custody of Gwendolyn. Father's counsel argued the domestic violence count should be dismissed because mother's disclosure lacked specificity and credibility. Father requested Gwendolyn be released to him.

DCFS asked the juvenile court to sustain the petition as pled. As to father, DCFS argued father failed to protect Gwendolyn as she had not been to school in several years and was largely in charge of caring for her siblings.

The juvenile court sustained the counts regarding mother's severe neglect of the children, causing Luna's death, and Vincent A.'s failure to protect the children from such neglect. The court also sustained the count alleging mother's abuse of alcohol and both fathers' failure to protect the children.

The court dismissed the allegation that father and Vincent A. had engaged in violent altercations with mother. It

also dismissed the allegation that father and Vincent A. knew or should have known about mother's mental problems and failed to protect the children from such problems.

The juvenile court sustained the allegation against father that he "knew or reasonably should have known about mother's substance abuse and failed to take action to protect" Gwendolyn, which endangered the child's "physical health and safety, create[d] a detrimental home environment, and place[d] the child at risk of serious physical harm, damage, [and] danger."

**Disposition**

In preparation for the dispositional hearing, DCFS submitted a report. Gwendolyn and father continued unmonitored visits, which went well. Gwendolyn was more comfortable with father and now wanted to live with him.

Father was in the process of renovating and building his home at the time DCFS made its assessment. Father wanted Gwendolyn to reside with the paternal aunt, Vanessa, until his home was finished and Gwendolyn could then live with him. Father was supportive of Gwendolyn as she processed the loss of her sibling, and he demonstrated a strong nurturing attachment to Gwendolyn. Father had the support of family with the transition of Gwendolyn to his home and was cooperative and respectful with social workers. DCFS recommended the juvenile court release Gwendolyn to father with the requirement that Gwendolyn live with Vanessa until father's home was completed. DCFS recommended father participate in conjoint family counseling with Gwendolyn.

The disposition hearing took place on April 18, 2025. The juvenile court released Gwendolyn to father's custody and ordered father to participate in family preservation services

11

including conjoint counseling with Gwendolyn if recommended by Gwendolyn's therapist.

Mother received enhancement services for Gwendolyn, including monitored visits, random drug testing, a drug treatment program, a 12-step program, a parenting program, mental health counseling, a psychiatric evaluation, and individual counseling. Mother was bypassed for reunification services with Amora.

Father filed a timely notice of appeal.

## DISCUSSION

### I.  Jurisdictional findings involving father

Father argues the jurisdictional findings regarding him should be dismissed because no substantial evidence supports them.

#### A.  *Justiciability*

We first address DCFS's argument that father's jurisdictional challenge is not justiciable.

"It is a fundamental principle of appellate practice that an appeal will not be entertained unless it presents a justiciable issue." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1489.) The juvenile court asserts jurisdiction when one parent's conduct has triggered the statutory bases for jurisdiction listed in section 300. (*In re I.A., supra*, at p. 1491.) Thus, "a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.) Because a single jurisdictional finding supports jurisdiction, a challenge to other jurisdictional findings "cannot render any relief to [the parent] that would have a practical, tangible impact on his position in the dependency proceeding." (*In re I.A., supra*, at p. 1492.) Under

12

such circumstances, the appeal is not justiciable and should be dismissed.  (*Id.* at pp. 1489–1490.)

However, an appellate court will generally exercise its discretion to reach the merits of any jurisdictional finding, even when other jurisdictional findings are unchallenged, if the finding (1) serves as the basis for dispositional orders that are also challenged on appeal; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings; or (3) could have other consequences for the appellant, beyond jurisdiction.  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763 (*Drake M.*), disapproved on other grounds in *In re N.R.* (2023) 15 Cal.5th 520, 550 & *In re D.P.* (2023) 14 Cal.5th 266, 283.)

Father cites *Drake M., supra*, 211 Cal.App.4th at page 763, arguing the challenged jurisdictional findings against him are "the difference between father's being an 'offending' versus a 'non-offending' parent."  The *Drake M.* court found "[s]uch a distinction may have far-reaching implications with respect to future dependency proceedings in this case and father's parental rights."  (*Ibid.*)

Because the language sustained in the jurisdictional finding including allegations against father is the difference between father being offending and nonoffending, we address the merits of father's appeal.

### B.     *Substantial evidence supports the jurisdictional finding as to father*

The juvenile court found father knew or should have known about mother's substance abuse and failed to take action to protect Gwendolyn, which endangered her physical health and safety, created a detrimental home environment, and placed the child at risk of serious harm.

Section 300, subdivision (b)(1), requires DCFS to demonstrate (1) the parent's neglectful conduct or inability to protect the child, (2) causation, and (3) serious harm or illness or a substantial risk of such harm or illness. (*In re E.E.* (2020) 49 Cal.App.5th 195, 205.) The juvenile court's jurisdictional findings are reviewed for substantial evidence. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.) Under this standard of review, we examine the entire record in the light most favorable to the findings of the juvenile court. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.)

We find substantial evidence supported the juvenile court's findings that father knew or should have known of mother's substance abuse and failed to protect Gwendolyn. Father admitted he knew mother abused alcohol. Although father said he thought mother had toned it down to just doing "weed," he also acknowledged her alcohol abuse was probably the reason she was not allowing anyone into the home. In addition, father was aware that mother was not taking care of her children, as he reported "Gwendolyn was the one feeding the kids all the time." Father knew Gwendolyn had her own food stamps and shopped for groceries herself, as she occasionally called father to pick her up from the store. From this evidence, the juvenile court could reasonably have concluded father should have known that mother's alcohol issues were unresolved and mother was neglecting the children because Gwendolyn was responsible for providing food for herself and her younger siblings.

Father also admitted he knew Gwendolyn did not go to the doctor or dentist and expressed concern for her lack of medical and dental care. Although father claimed he was unaware Gwendolyn was not enrolled in school, the juvenile court was not required to believe his testimony, especially in light of his

testimony showing he knew Gwendolyn was caring for her younger siblings.

These facts show father's neglectful conduct. He knew or reasonably should have known mother's substance abuse was harming Gwendolyn. Although he claims he was shut out of mother's house, and mother alienated Gwendolyn from him, such events had taken place only within the previous year.[7] Gwendolyn had not attended school for approximately five years. She lacked medical and dental care and was forced to provide food for herself and her younger siblings. Father knew most, if not all this neglect was occurring, and failed to protect her. Substantial evidence supports the juvenile court's jurisdictional findings against him.

## II. The juvenile court did not err in maintaining jurisdiction over Gwendolyn

Father argues the juvenile court erred in maintaining jurisdiction over Gwendolyn because father was granted custody at disposition, and there remained no need for juvenile court jurisdiction. Father argues the juvenile court should have terminated jurisdiction and proceeded pursuant to either section 361.2, subdivision (b) or *In re A.G.* (2013) 220 Cal.App.4th 675.

Section 361.2, subdivision (b) provides that where a court removes a child from one parent, it should place the child with a previously noncustodial parent unless the court has determined placement with the previously noncustodial parent could be detrimental to the safety, protection, or physical well-being of the

---

[7] Father stated he had been blocked from mother's home for about six months. However, he also said he was in the home about four months prior to his first interview.

15

child.  Absent a finding of detriment to the child, the court may terminate jurisdiction with a custody order.  (*Ibid*.)

Pursuant to *In re A.G., supra*, 220 Cal.App.4th 675, where one parent may safely retain custody of the child, a juvenile court may dismiss the dependency petition and stay the order until the parent obtains an award of custody from the family court.

A juvenile court's determination as to whether to maintain jurisdiction when a child is removed from one parent and placed with another is reviewed for abuse of discretion.  (See *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1135.)  Under this standard, we will not disturb the juvenile court's decision unless it was arbitrary, capricious, or patently absurd.  (*In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1456.)  "When deciding whether to terminate jurisdiction, the court must determine whether there is a need for continued supervision, not whether the conditions that justified taking jurisdiction in the first place still exist . . . ."  (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.)

The juvenile court did not abuse its discretion in determining there was a need for continued supervision over Gwendolyn.  Father and Gwendolyn had limited contact prior to the dependency proceeding; thus the court was justified in monitoring the progression of their relationship.  (See *In re Austin P., supra*, 118 Cal.App.4th at p. 1134 ["[S]ubstantial evidence showed a need for continuing supervision.  The Agency felt it should monitor Austin's transition into father's home, in view of their sporadic contact over the past 10 years."].)  Gwendolyn was just getting comfortable with father, who did not have a suitable home for Gwendolyn at the time of the hearing.  Gwendolyn would be temporarily living with a paternal aunt while recovering from the trauma of losing her half sibling and

becoming comfortable with her new home and school.  Further, father had failed to protect Gwendolyn from mother's substance abuse in the past, thus the juvenile court was justified in maintaining jurisdiction to ensure Gwendolyn would be adequately protected while in his care.  (*Ibid.*)  Under the circumstances, the juvenile court's order maintaining jurisdiction over Gwendolyn was not an abuse of discretion.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

CHAVEZ, J.

We concur:

LUI, P. J.

RICHARDSON, J.