Filed 2/27/24  In re I.B. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.B., et al. Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.B., <br><br> Defendant and Appellant. | A168435 <br><br> (Solano County Super. Ct. Nos. JD23-00017, JD23-00018) |

Noncustodial parent D.B. (Father) appeals from jurisdictional findings and dispositional orders regarding his daughters I.B. and J.B.  Father contends the jurisdictional findings are not supported by substantial evidence and the juvenile court erred in finding the Indian Child Welfare Act (ICWA) does not apply.

We will vacate the finding that ICWA does not apply and remand for compliance with ICWA, and affirm the court's findings and orders in all other respects.

## FACTS AND PROCEDURAL HISTORY

*Background*

Father and B.B. (Mother) are the parents of I.B., born in 2005, and J.B., born in 2008 (together Minors). The Solano County Health and Social Services Department (Department) has received many referrals for the family over the years.[1]

In the referrals leading to the current dependency, it was reported that the older daughter, I.B., had been arrested for child prostitution in Las Vegas and law enforcement had been unable to contact Mother. I.B. had a baby (born in 2021), and a maternal relative reported the baby's father had initiated sex trafficking of I.B. and he was in prison for charges related to sex trafficking. I.B. told a social worker in Las Vegas that she was a prostitute. I.B. said she had been with her boyfriend, who was 30 years old and a pimp, since she was 14 years old, and he made her work in Oakland.

It was further reported that Mother was not taking her bipolar medication, and she believed "The Illuminati" wanted to kill her. The younger daughter, J.B., called 911 because Mother was behaving erratically, screaming, and breaking plates outside. Mother was placed on an involuntary psychiatric hold.

*Dependency Petition*

On May 15, 2023, the Department filed a dependency petition on behalf of Minors. As to Mother, it was alleged she was unable to provide regular care due to mental illness (see Welf. & Inst. Code,[2] § 300, subd. (b)(1)(D)), she

---

[1] Prior to the reports resulting in the current dependency, there were 19 referrals involving Minors from October 2008 to October 2022.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

failed to, or was unable to, protect I.B. (see § 300, subd. (b)(1)(A) and (4)), who "has been a victim of commercial sexual exploitation since approximately 2020," and Minors were left without any provision for support (§ 300, subd. (g)). As to Father, it was alleged Minors were left without provision for support (*ibid.*) in that Father's whereabouts were unknown and the Department's efforts to locate him had been unsuccessful.

The juvenile court ordered Minors detained from both parents pending further investigation and a jurisdictional hearing.

*Jurisdiction/Disposition Report and First Jurisdictional Hearing*

In a jurisdiction/disposition report filed June 21, 2023, the Department recommended amending the petition based on further investigation. The following factual allegations were recommended: "*b-1) The mother, [B.B.], has a severe psychiatric disorder, including, but not limited to, a diagnosis of Bipolar Disorder with psychotic features. [Mother] has failed to consistently take her prescribed psychotropic medication, which has resulted in ten (10) reported psychiatric hospitalizations since 2014. Therefore, the mother has periodically been unable to provide adequate care, support, and supervision for the minors . . . . On or about May 08, 2023, the mother was placed on a psychiatric hold after she exhibited erratic behavior, paranoid delusions, agitation, and was breaking glass, causing the minor, [J.B.], to become fearful. [Mother]'s failure to address her mental health issues places the minors at substantial risk of suffering serious physical harm or illness."

"*b-3) The father, [D.B.], knew or reasonably should have known, that the minors . . . were not safe in the mother's care, as the father was aware of the mother's unstable mental health issues. Despite the father's concerns, he did not take active steps to protect the minors from the mother's behavior

3

and he has not provided consistent care for them, thus placing the minors at substantial risk of suffering serious physical harm or illness."

"*b(2)-1 The minor, [I.B.], has been sexually exploited since approximately 2020, in which her parents, [B.B.] and [D.B.], have been unable to keep her safe. The minor's actions and behaviors include, but are not limited to: [¶] 1. Running away from home, days to weeks at a time. [¶] 2. Being truant from school. [¶] 3. Having a one (1) year old child with a thirty (30) year old male, she began a relationship with in 2020. [¶] 4. Visiting areas in Oakland, CA and Las Vegas, NV which are known for high levels of sexual trafficking. [¶] 5. Being detained on at least one (1) occasion, on 04/27/2023, by Las Vegas Police Department for being involved in 'CSEC' [commercially sexually exploited children[3]] activities."

"g-1) The minors . . . have been left without provisions for support in that the mother . . . is currently institutionalized in a psychiatric facility, and unable to provide care and supervision, or arrange for care for the minors in her absence."

The Department recommended dismissing the allegation that Father left Minors without provision for support.

---

[3] Section 300, subdivision (b)(4), provides: "The Legislature finds and declares that a child who is sexually trafficked, as described in Section 236.1 of the Penal Code, or who receives food or shelter in exchange for, or who is paid to perform, sexual acts described in Section 236.1 or 11165.1 of the Penal Code, and whose parent or guardian failed to, or was unable to, protect the child, is within the description of this subdivision, and that this finding is declaratory of existing law. These children shall be known as commercially sexually exploited children [(CSEC)]." This means a parent's failure or inability to protect a child from sexual trafficking constitutes "failure or inability of the child's parent . . . to adequately supervise or protect the child" as the phrase is used in section 300, subdivision (b)(1)(A).

4

The additional information the Department gathered included the following.

Regarding Mother's alleged inability to care for Minors due to mental illness, Mother's cousin E.B., who was also J.B.'s current caregiver,[4] stated that Mother has had mental health issues most of her life. E.B. reported that Mother was diagnosed with bipolar disorder, that Mother has severe mania and depression and becomes paranoid during mental health crises, and that Mother has been in and out of psychiatric hospitals for most of Minors' lives.

As to the allegation that Father knew of Mother's instability and failed to protect Minors, E.B. said that Mother and Father had an off and on relationship for the previous 10 years and whenever Father wanted to see Mother, she would agree, and the parents would leave I.B. and J.B. alone while they spent time together. E.B. stated that Father would constantly call Mother "crazy," but he still would "mess with her whenever he wanted." After spending time with Father, Mother would return home and have "mental breakdowns." J.B. similarly reported that Mother had mental health crises a couple times a year, often after spending a few days with Father alone in a hotel. (In addition, I.B. said that Father "triggers" Mother.) J.B. told a social worker that Mother would return home from spending time with Father "very angry, erratic, calling [her] and [I.B.] whores and bitches, and having paranoid thoughts." During the most recent mental health incident (which led to the current petition), J.B. felt "overwhelmed and scared."

J.B. said that, in the past, her current caregiver, E.B., and other relatives would take care of her and I.B. when Mother was hospitalized or in crisis, and Father did not provide care when Mother was in the hospital. E.B.

_____

[4] I.B. was not staying with the maternal cousin, and the Department did not know where she was through most of the dependency proceedings.

5

likewise reported that whenever Mother had a mental health crisis, E.B. and her family would provide full-time care for I.B. and J.B., as Father and his family did not assist with their care. E.B. said that when Father was confronted about not providing care for Minors in the past, his response was, "they're not his only kids and . . . he's busy because he is a rapper."

J.B. said she did not have a close relationship with Father; she had not visited Father's home and did not know where he lived. (She reported that Father changes his living situation frequently.) J.B. said, throughout the years, Father did not provide financial support or take care of her and I.B. at times he knew Mother was in the hospital.

Regarding the allegation that both parents failed to protect I.B. from exploitation, J.B. reported that she and both parents suspected I.B. was involved in prostitution. I.B. would run away from home, post on social media that she was in Las Vegas and other cities, and dress in provocative ways. I.B. did not say what she did or how she had money, and Mother and Father would not ask. J.B. said the father of I.B.'s baby was in jail for abusing girls. E.B. reported that Mother, Father, and other relatives suspected I.B. was engaged in prostitution and that several family members tried to get I.B. out of the "trap house" where they believed I.B. was being exploited.[5] I.B. said she was 14 years old when she began a relationship with S.P., the father of her child, and the relationship lasted about three years.

The Department's efforts to interview the parents were unsuccessful as neither Mother nor Father responded to calls and letters. The Department's assessment of Father was that he "has not been consistent in providing

---

[5] However, I.B. herself said that her parents did not know she was the victim of sexual exploitation until she was arrested in Las Vegas on April 27, 2023.

appropriate care and supervision of his daughters . . . even though he knew . . . their mother has unstable mental health issues. The father has also been unable and/or unwilling to protect [I.B.] from the exploitation of others for the past three (3) years."

At the scheduled jurisdictional hearing on June 27, 2023, J.B. attended with her attorney, but Mother, Father, and I.B.[6] were absent, although attorneys representing each of them were present. County counsel asked to continue the matter to allow the Department time to follow up on ICWA notices.

*Addendum Report*

On July 20, 2023, the Department filed an addendum report to the jurisdiction/disposition report. After many attempts, a social worker was able to speak with Father by telephone on July 6. He said he was homeless and liked that J.B. was placed with maternal relatives because he was not in a position to care for Minors. Father reported Mother had ongoing mental health issues for years and he knew she had a history of numerous psychiatric holds and hospitalizations. He and Mother separated years ago and are now divorced, but Father said he and Mother still "go out on dates and hang out for a couple of days" but then he leaves her because "she starts tripping out." He reported he had cared for Minors for a couple years due to Mother's mental health issues, but then Minors returned to the maternal family or Mother's care. Father said he had no prior knowledge of I.B. being sexually exploited. He told the social worker he had concerns about I.B.'s behavior two or three years earlier when I.B. was in his care full time.

---

[6] Previously, county counsel had informed the court that I.B. was "AWOL right now, she's missing," and at the hearing, I.B.'s attorney stated he had not yet been able to contact I.B.

Father found out I.B. was having sexual contact with various "guys." He reported that he confronted I.B. but she refused to stop and went to live with a maternal relative. The Department wrote that Father "said he tried to address his concerns, but he could not control [I.B.'s] sexualized behaviors."

After many attempts, the social worker was also able to speak with Mother by telephone. Mother denied she ever stopped taking her psychotropic medication and denied she had a mental health crisis on May 8, 2023. She stated she was placed in a psychiatric hospital for five days but declined to discuss her mental health history. Mother said it was not fair that the police and the Department believed J.B.'s account of her mental health and functioning.

*Hearing on Jurisdiction and Disposition*

At the jurisdictional hearing on July 27, 2023, Minors were present with their attorneys and caregiver E.B. was present, but Mother and Father did not attend.[7] I.B.'s attorney and J.B.'s attorney submitted on the Department recommendation.

Father's attorney argued that Father was not an offending parent: "While he was aware of the mental health struggles of the mother, he was limited on what he's able to do to interfere for the minors. . . . Mother was under care of professionals and taking medication, and there has always been a family understanding that in the event that the mother was struggling with her mental health, [E.B.] has opened her home to the minors. And that is where they prefer to be . . . ." "With regard to the B2-1 allegation" (failure to protect I.B. from exploitation), Father's attorney said, "there is no evidence

---

[7] Father's attorney told the court that Father was unable to secure a ride to court.

besides [E.B.]'s speculative statement that [Father] knew [I.B.] was involved in CSEC behavior."

County counsel argued Father knew or reasonably should have known Minors were at times unsafe with Mother but he did nothing to protect them, asserting: "He himself stated he knows the mom's mental health issues. She's been hospitalized, . . . [and] he said he had to ignore the mother due to her own behavior. There is no stated plan he had with the minors that they needed to call the relatives or call him when the mother was exhibiting these behaviors. Both minors state father really has never taken care of them or knew or should have known leaving them in the care, you know, put the minors at risk of the mom's mental health."

"Regarding the . . . CSEC behavior," county counsel argued Father "knew a lot of different things, that the minor was running away, that the minor was engaging in different activities," noting J.B. reported both parents were aware that I.B. "was posting social media posts, that she was going to different cities, that she was having money. . . and also knew she had a child with an older adult."

*Court Findings*

The juvenile court found true for both Minors the amended allegations of b-1 (pertaining to Mother's mental illness) and b-3 (pertaining to Father's failure to protect Minors from Mother's unstable mental health issues), and, for I.B. only, the allegations of b(2)-1 (pertaining to both parents' inability to keep I.B. safe from CSEC activity).[8]

---

[8] The juvenile court struck the allegations Minors were left without provision for support under section 300, subdivision (g), at the Department's request.

9

## DISCUSSION

A.    *Justiciability*

Initially, respondent argues Father's appeal is moot because dependency jurisdiction attaches to the child, not to the parent, and, in this case, Mother has not appealed.  (See *In re D.P.* (2023) 14 Cal.5th 266, 283 ["where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot"].)

However, an appeal is not moot "when a juvenile court's finding forms the basis for an order that continues to impact a parent's rights."  (*In re D.P.*, *supra*, 14 Cal.5th at p. 276.)  This is because a "reversal of the jurisdictional finding calls into question the validity of orders based on the finding" and thus could "grant the parent effective relief."  (*Id.* at pp. 276–277.)  Here, Father points out the juvenile court ordered him to participate in mental health services and parenting education, implying that these orders would be set aside if the jurisdictional findings against him were reversed.

In addition, our high court has recognized that dismissing a parent's appeal of a dependency order as moot "may ' "ha[ve] the undesirable result of insulating erroneous or arbitrary rulings from review" ' " and could be prejudicial to the appealing parent.  (*In re D.P.*, *supra*, 14 Cal.5th at p. 285.)  Father argues the juvenile court's findings against him are likely to prejudice him in this or future dependency proceedings.  In these circumstances, even assuming Father's appeal is moot, we exercise our discretion to consider Father's appeal on the merits.  (See, e.g., *In re Nathan E.* (2021) 61 Cal.App.5th 114, 121 [considering mother's appeal on the merits where she claimed "findings in this matter may impact any possible future dependency proceeding involving these or any children mother may have in the future"].)

10

B.    *The Findings and Orders*

We reject Father's first argument that the findings and orders should be reversed because the Department used outdated Judicial Council forms for the petition.

The operative amended petition was prepared on a version of Judicial Council form JV-121 that was revised July 1, 2016, at a time when a more recent version of JV-121 (revised February 1, 2023) was available.  The petition in this case alleges, under "§ 300(b)(2)," "The child's parent or guardian has failed to, or was unable to, protect the child, and the child" "has been or is being sexually trafficked, as described in section 236.1 of the Penal Code."  The new version of JV-121 contains the same words but is now under "§ 300(b)(4)" reflecting the fact that the provision on CSEC (see fn. 3), which was previously at subdivision (b)(2) (see former § 300, subd. (b)(2) as amended by Stats. 2021, ch. 98, § 1) has been renumbered as subdivision (b)(4) without any change to the language (see Stats. 2022, ch. 832, § 1).

Father argues, "Reversal and remand is required for the court to correct its findings and orders to reflect that jurisdiction had been sustained under section 300, subdivision (b)(4), not under subdivision (b)(2)."  This argument is forfeited because Father did not object that the Department used an outdated petition form with the juvenile court when the error easily could have been corrected.  (See *In re C.M.* (2017) 15 Cal.App.5th 376, 385 [" 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court.  [Citations.]  Forfeiture . . . applies in juvenile dependency litigation . . . to prevent a party from standing by silently until the conclusion of the proceedings' "].)  Moreover, Father has not shown any prejudice from the alleged error.  (See *In re Celine R.* (2003) 31 Cal.4th 45, 60 [state law harmless error applies in dependency

11

proceedings].)  Father does not claim the judicial form JV-412 used for the findings and orders was outdated, and that form correctly shows the petition was sustained under "300(b)."  Nor does Father claim he was misled about the allegations against him.  We see no reason to reverse in this case merely because the petition was prepared on an outdated form.

C.    *Substantial Evidence*

Father next contends no substantial evidence supports a finding he was unable or unwilling to protect Minors.  We disagree.

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' "  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  Father "has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Under section 300, subdivision (b), a child is within the jurisdiction of the juvenile court and may be adjudged a dependent of the court where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . "[t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" (§ 300, subd. (b)(1)(A)), "[t]he willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left," (*id*., subd. (b)(1)(B)), or "[t]he inability of the parent . . . to provide regular care for the child due to the parent's . . .

12

mental illness, developmental disability, or substance abuse" (*id.*, subd. (b)(1)(D)).

Here, there was sufficient evidence to support a finding that Mother was unable to provide regular care due to mental illness. Father does not dispute that Mother had been hospitalized numerous times in the past for mental illness and, during the most recent incident, Mother experienced a mental health crisis and was hospitalized after failing to take her medicine, scaring J.B. and leaving her home alone.[9] (See, e.g., *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226 [sufficient evidence to find jurisdiction under section 300, subdivision (b), where the mother "continued to go unmedicated at times [and] continued to experience severe episodes related to her illness"].)

There was also substantial evidence that Father failed to protect Minors from the risk of harm that arose when Mother experienced mental health crises. There is no doubt that Father was aware of Mother's difficulties; Father reported he knew Mother had ongoing mental health issues for years and she had a history of numerous psychiatric holds and hospitalizations. Both J.B. and E.B. stated that neither Father nor his family took care of Minors when Mother was in mental health crisis or hospitalized. They also reported that Father precipitated Mother's mental health crises as he would spend days with Mother away from Minors and then she would return home and have a mental breakdown. Father confirmed these reports, stating that he and Mother would hang out for a couple days and then he would leave her when she started "tripping out." Yet

---

[9] We note that there is no evidence that either Mother or Father had a safety plan in place for times when Mother experienced a mental health episode. Mother, for her part, appeared to be in denial about the severity of her episodes.

Father did not claim he arranged for Minors' care either when he took Mother away from them or when he knew she was hospitalized.

As the juvenile court explained, Father was "aware of . . . mom's situation.  What . . . mom is going through is something that is very overwhelming.  It requires a lot of support. . . .  It requires a plan in place.  A lot of different things have to be in working order for everybody to be safe, including . . . mom.  [Father] knows that. . . .  So he has a responsibility to [Minors] to make sure that he's taking care of what he needs to take care of so [Minors] are safe in her care, and he didn't."[10]

Father also argues no substantial evidence supports the finding that he knew or should have known I.B. was involved in CSEC activities and failed to protect her.  Having found substantial evidence to support the finding Father failed to protect Minors when Mother experienced mental health crises and was hospitalized, we need not consider whether this additional basis for jurisdiction over I.B. is supported by substantial evidence.  (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773 [when one of the statutory grounds for jurisdiction is supported by substantial evidence, " 'the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence' "].)

But, in any event, substantial evidence supported the finding.  Both J.B. and E.B. said that Mother and Father suspected I.B. was involved in prostitution.  The suspicions were apparently based on the circumstances that I.B. would run away from home, post on social media that she was in

---

[10] Thus, this case is not like *In re A.G.* (2013) 220 Cal.App.4th 675, 683, cited by Father, in which the appellate court concluded it was error to sustain a petition where the mother's mental illness rendered her unable to care for her children, but the father "has always been, and is, capable of properly caring for them."

Las Vegas and other cities, and dress in provocative ways, and that she had money and did not explain how she obtained it. E.B. reported that several family members tried to get I.B. out of a "trap house" where they believed I.B. was being exploited. Father admittedly knew I.B. was having sex with many partners when she was living with him, and, according to the Department's report, Father told a social worker he was unable to control her sexualized behaviors. While I.B. claimed her parents did not know she was involved in prostitution, she also said she was in a relationship with her pimp for three years, and she had a child with him. Regarding the CSEC allegations, the juvenile court observed Father "probably wasn't paying attention or chose not to pay attention. That's not the obligation of a parent, to look away or turn away." On this record, there was sufficient evidence for the court to find Father knew or *should have known* I.B. was being sexually trafficked and he failed or was unable to protect her.

D. *ICWA*

" 'ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation.' " (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 740.) ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8, quoting 25 U.S.C. § 1902.)

Under state law, "[t]he court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 may be or has been filed, is or may be an Indian child. The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting

15

child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).)

"If the initial inquiry provides 'reason to believe' that an Indian child is involved in a proceeding—that is, if the court or social worker 'has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe'—then the court or social worker 'shall make further inquiry' regarding the child's possible Indian status as soon as practicable. (§ 224.2, subd. (e).) Further inquiry 'includes, but is not limited to, all of the following: (A) Interviewing the parents, Indian custodian, and extended family members. . . . (B) Contacting the Bureau of Indian Affairs [(BIA)] and the State Department of Social Services . . . [and] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' (*Ibid*.)" (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 999.)

In the present case, Father's attorney told the court at the detention hearing in May 2023, "[Father] indicates that he may be a member" [of an Indian tribe].

The Department made further inquiries, which were documented in an addendum ICWA compliance report filed July 20, 2023. A social worker spoke with Father's mother, Marcy B., who reported the family may have Choctaw ancestry, but she knew no further information. Marcy B. declined to provide contact information for her mother, A.S. (Minors' great-grandmother), who she said was very ill. A social worker spoke with Father's father, Bryant B., who reported he may have Native American ancestry through his great-grandmother, Mary C., but he did not know the tribe and had no further information on Mary C. Bryant B. declined to provide

16

information on his mother, M.C. (Minors' great-grandmother), stating she has dementia. (Father's grandfathers were both deceased.

On June 15, 2023, the Department sent ICWA notices to the BIA and the three federally recognized Choctaw tribes (Jena Band of Choctaw Indians, Mississippi Band of Choctaw Indians, and the Choctaw Nation of Oklahoma). Another ICWA notice was sent to the BIA and the tribes on June 30, 2023. A social worker followed up by faxing, emailing, and calling the BIA and the tribes. By letter, the Mississippi Band of Choctaw responded that the family members (Minors, Mother, and Father) were not enrolled members and were not eligible for enrollment. The ICWA compliance report does not document any other responses.

At the hearing on jurisdiction and disposition on July 27, 2023, county counsel informed the court, "My social worker followed up with the tribes, and . . . there was no confirmation that the children fall under [ICWA]." The juvenile court then found "ICWA does not apply based on the current information that we have."

On appeal, Father contends the Department conducted insufficient "further inquiry" (§ 224.2, subd. (e)) to determine whether ICWA applied. He argues (1) diligence was not shown in obtaining responses from the two remaining tribes, (2) there was no diligence in attempting to obtain information concerning Mary C. as "[t]here is no indication that other relatives were asked for her information and tribal affiliation," (3) the Department was not diligent in that it did not ask Bryant B.'s brother, Byron B., about tribal affiliation or Mary C., even though Byron B. was in contact with the Department, and (4) even though Father's parents declined to provide contact information about their mothers (Minors' great-

17

grandmothers), the Department should have tried to obtain information about them from other relatives.

We reject most of Father's arguments. The Department appeared to be very diligent in seeking responses from the tribes, and Father offers no authority suggesting due diligence requires attempting to contact unspecified "other relatives" when grandparents decline to provide information about their ill or infirm parents. (Cf. *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1006 [noting parents may "refuse to provide [an agency] with any relative information, making contact with extended family impossible"].)

Respondent, however, concedes the Department did not ask Byron B. if he had any information regarding Native American ancestry even though "contact with Byron B. was readily obtainable." Respondent argues the Department nonetheless substantially complied with ICWA's further inquiry mandate. But in *In re Benjamin M.*, *supra*, 70 Cal.App.5th at page 744 (cited by both parties), the court held that reversal is required "where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." Here, information from Byron B. was readily obtainable, as the Department received a letter from Byron B. regarding dental work for J.B., which included his work address, phone number, and email address. Under these circumstances, we will vacate the juvenile court's finding that ICWA does not apply and remand for the juvenile court to direct the Department to follow up with Byron B. to inquire about Indian ancestry and, depending on the information received, conduct further inquiry. (See, e.g., *In re A.C.* (2022) 75 Cal.App.5th 1009, 1018 [affirming jurisdictional and dispositional orders and remanding for the agency to comply with its duty of inquiry under section 224.2]; *In re Dominick D.* (2022) 82 Cal.App.5th 560, 564 [vacating ICWA

18

finding, remanding for compliance with ICWA and related California law, and otherwise affirming the dispositional findings and orders where the agency failed to discharge its statutory duty of inquiry under section 224.2].)

## DISPOSITION

The juvenile court's finding that ICWA does not apply is vacated, the matter is remanded, and the juvenile court is directed to order the Department to conduct further ICWA inquiry consistent with this opinion. The juvenile court's jurisdictional and dispositional orders are otherwise affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P. J.


_____
Richman, J.


A168435, *Solano County Health and Social Services Department v. D.B.*